JANUARY TERM, 1870.        167

Whiting vs. The Sheboygan & Fond du Lac Railroad Company and others.

# JANUARY TERM, 1870.

WHITING VS. THE SHEBOYGAN AND FOND DU LAC RAIL-
ROAD COMPANY and others.

*Constitutional Law: Limits of the power of taxation —Aid to railroads.*

1. A tax for a *private purpose* is invalid.
2. In the case of a railroad owned by a private corporation, in whose favor the right of eminent domain may be exercised, the *public use* consists in the right of the public to the carriage of persons and property upon tender of a proper consideration, and in the power of the state to control the franchise and limit the tolls.
3. Such a qualified and limited public use will not support *taxation* for the purpose of raising money to be *donated* to such a corporation.
4. Ch. 448, Private and Local Laws of 1867, which authorizes the supervisors of a county (after an affirmative vote of the people of the county upon the question, and after certain portions of said company's road have been graded) to issue county orders in aid of the road, and levy a tax to pay such orders, *the county not becoming a stockholder in the company, held* invalid, as not a legitimate exercise of the taxing power.

PAINE, J., dissenting, holds that the construction of a railroad is a public purpose, for which the power of taxation, as well as that of eminent domain, may be exercised, although the road is constructed and owned by a private corporation.

APPEAL from the Circuit Court for *Winnebago* County.

Chapter 448, Private and Local Laws of 1867, entitled "An act to authorize the county of Fond du Lac to aid the completion of the Sheboygan and Fond du Lac railroad, and aid the building of a railroad from the city of Fond du Lac to the city of Ripon," provided, in substance, that an election should be held in said county

to determine whether it would render aid to the former road to the amount of $90,000, and to the latter to the amount of $60,000 ; and that if a majority of the votes cast at such election should be in favor of rendering such aid, then, upon certain proof being filed with the clerk of the board of supervisors of said county, showing that the first-named road had been graded continuously between two specified points in said county, the company owning the road should be entitled to receive from the county, within ten days after demand, county orders to the amount of $30,000, payable to bearer on demand, or at a time not exceeding one year from their date, with interest at seven per cent, as the board of supervisors should determine ; and whenever like proof should be filed that the road had been graded to another specified point, said company should be entitled to receive from the county a further sum of $30,000 in county orders, payable on demand, or at a time not exceeding two years from date, as the board should determine ; and when like proof should be filed that the road was fully completed and in running order to the city of Fond du Lac, the company should be entitled to receive from the county a further sum of $30,000 in county orders, payable on demand, or in three years, etc., etc. Similar provisions are made in respect to the extension of aid to the second road above named. The act further provided that if the county should furnish such aid, the two railroad companies, their successors and assigns, should transport wheat upon their roads upon certain specified terms for ten years. It then authorized the board of supervisors of said county to levy upon all the taxable property of the county "a tax sufficient from time to time to meet the indebtedness of said county, under the provisions" of the act, "and for the payment of the same ;" and provided for receiving said county orders in payment of such tax. It further provided that, in case the work specified should not be completed,

and said orders demanded, within two years from the taking of the vote upon the question, then the same should cease to be binding upon the county, and be of no effect.

In May, 1868, *Warren Whiting*, "a freeholder, tax payer, citizen and resident of Fond du Lac county," brought this action "in his own behalf, and in behalf of all others of like interest with himself, to wit, in behalf of himself and all other tax payers" of that county, against the *Board of Supervisors* of the county, and the clerk and chairman thereof, and *The Sheboygan and Fond du Lac Railroad Company*. The complaint averred, in substance, that a vote was taken in said county on the 5th of November, 1867, in alleged pursuance of the above recited act, and that a majority of the votes cast upon the question were in favor of aid to said railroad; that soon afterward the defendant railroad company, for the purpose of receiving from the county the first sum of $30,000 in county orders above mentioned, commenced grading its road between the two points first mentioned in the act; that this portion of the road was nearly completed, and the company claimed that when said grading was fully completed it would be entitled to receive said county orders, within ten days after demand, and declared that it intended to make such demand, etc., etc. It was also averred that such demand would be made, and such county orders issued to the company within thirty days from the date of the complaint, unless said board of supervisors and their chairman and clerk should be restrained from issuing and delivering the same. Similar allegations were made in regard to the intention of the company to complete the grading of the other two sections of the road, and to demand the other two payments of $30,000 each in county orders, etc.. etc. ; and the provisions of the above recited act in respect to the issue of such orders, the levy of a tax to pay the same, etc., were set forth. And it was averred that there would be no way to distinguish county

orders issued under the act from others issued for ordinary county purposes. The complaint then contained various allegations designed to show that the road, when built, would not be advantageous, but rather detrimental, to the interests of the plaintiff and of many other residents and tax payers of said county. Prayer: that said board of supervisors, and its chairman and clerk, be restrained from issuing, and said railroad company from receiving, any county orders in pursuance of said act of the legislature; that all the defendants be forever restrained from taking any proceeding under said act; and that the act be adjudged void.

Upon this complaint, duly verified, and upon an affidavit of one H. C. Whiting and one Scofield, declaring the allegations of the complaint to be true, a temporary injunction was granted by a court commissioner on the 19th of May, 1868.

The summons in the action is dated May 23, 1868; but there is nothing in the printed case to show the date of its service. The answer of the defendants is dated July 7, 1868. Afterward defendants moved to dissolve the temporary injunction; founding their motion upon the pleadings and the affidavit above mentioned, and upon certain affidavits and exhibits filed in their behalf. The contents of the latter, and of the counter affidavits subsequently filed by the plaintiff, need not be stated here. They related to the questions, whether the construction of the railroads above named would be advantageous or detrimental to the plaintiff and those in whose behalf he brought this action, and whether fraudulent means had been used by agents of the defendant company to prevent a fair expression of the wishes of the people at the election aforesaid, in respect to granting aid to said railroads. On the 12th day of November, 1868, the motion to dissolve was denied; from which decision the defendants appealed.

At the trial, after proof that he was a resident freeholder and tax payer in Fond du Lac county, plaintiff offered

testimony to show that the construction of the defendant's railway would not be advantageous to him, or to persons residing in the town of which he was a resident, or to persons residing in several adjoining towns of said county ; but the evidence was rejected.

Judgment for the defendants (January 19, 1869) ; from which the plaintiff immediately appealed. This appeal and that of the defendants were argued here together.

*J. A. Bentley* and *Matt. H. Carpenter*, for the defendants, contended that the power of the legislature to authorize a municipal corporation to raise money by tax in aid of railroads was completely settled by repeated adjudications of this and other courts ; and they cited *Bridgeport v. R. R.*, 15 Conn. 475 ; *Sharpless v. Mayor of Philadelphia*, 21 Pa. St. 148 ; *Thomas v. Allegheny Co.*, 7 Law Reg. 92 ; *Talbot v. Dent*, 9 B. Mon. 526 ; *Cheaney v. Hooser*, id. 330 ; *Slack v. Maysville*, 13 id. 1, 30, 31 ; *Goddin v. Crump*, 8 Leigh, 120 ; *Nichol v. Nashville*, 9 Humph. 252 ; *Railroad Co. v. Clinton Co.*, 1 Ohio St. 77 ; *Steubenville, &c., R. R. Co. v. Township*, id. 105 ; *Cass v. Dillon*, 2 id. 607 ; *Shaw v. Dennis*, 5 Gilm. 405 ; *Ryder v. Railroad*, 13 Ill. 516 ; *Strickland v. Railroad*, 21 Miss. 209 ; *Dubuque Co. v. D. & P. Rw.*, cited in Redfield on Railways, 534 ; *V. S. & T. Railroad v. Ouachita*, 11 La. Ann. 649 ; *Parker v. Scogin*, id. 629 ; *People v. Brooklyn*, 4 Coms. 419. This question has been repeatedly before this court, and has been determined in harmony with the foregoing cases : *Bushnell v. Beloit*, 10 Wis. 195 ; *Clark v. Janesville*, id. 136 ; *Hasbrouck v. Milwaukee*, 13 id. 37 ; 17 id. 266 ; *Dean v. Madison*, 9 id. 402. The objection that the county did not receive stock of the railroad company is of no avail. The public benefit, which the legislature and the electors have determined will result from this improvement, is a sufficient consideration. *Soens v. Racine*, 10 Wis. 271 ; *Hasbrouck v. Milwaukee*, 13 id. 37.

*Bennett & Norcross*, for plaintiff :

The property of the citizen cannot be taken for any

other than a public use. *In ·the Matter of Albany street*, 11 Wend. 149 ; *Bloodgood v. M. & H. R. R. Co.*, 18 id. 59 ; *In the Matter of John and Cherry Streets*, 19 id. 659 ; *Varick v. Smith*, 5 Paige, 137, *Taylor v. Porter*, 4 Hill, 147 ; *Embury v. Conner*, 3 Coms. 511 ; *Symonds v. City of Cincinnati*, 14 Ohio, 147 ; *Bradley v. R. R.*, 21 Conn. 294 ; *Dunham v. Williams*, 36 Barb. 136 ; *Pratt v. Brown*, 3 Wis. 603 ; *Reeves v. Treasurer of Wood Co.*, 8 Ohio St. 344 ; Cooley's Const. Lim. 530. Such property can be taken for a public use, only upon condition of making full compensation. Const. of Wis., art. 1, sec. 13 ; Ordinance of 1787, art. 2. The compensation here referred to means a compensation in money. Cooley on Const. Lim. 559 ; *Fletcher v. Peck*, 6 Cranch, 145 ; *Bradshaw v. Rogers*, 20 Johns. 103 ; *The People v. Mayor, &c., of Brooklyn*, 4 N. Y. 419 ; *Carson v. Coleman*, 3 Stockton, 106 ; *United States v. Minn., &c. R. R. Co.*, 1 Minn. 127 ; *Railroad Co. v. Ferris*, 26 Tex. 603 ; *Curran v. Shattuck*, 24 Cal. 247 ; *State v. Graves*, 19 Md. 351 ; Bennett's Shelford on Railways, 441 ; *Reitenbaugh v. R. R. Co.*, 21 Pa. St. 100 ; *Robbins v. R. R. Co.*, 6 Wis. 636, 642, 643 ; *Shepardson v. R. R. Co.*, id. 605 ; *Norton v. Peck*, 3 id. 714, 722, 723 ; *Powers v. Bears*, 12 id. 213 ; *Newell v. Smith*, 15 id. 101. On these grounds counsel argued that the act of 1867, in question, could not be upheld as an exercise of the right of *eminent domain*. 2. The act cannot be upheld as an exercise of the power of *taxation*. Money can be raised by taxation only for *public* purposes. 2 Burr. Law Dic. 509, under the word " Tax ;" Blackw. on Tax. Tit. 7 ; 11 Johns. 80 ; 2 Inst. 532 ; Carthew, 438 ; Cooley's Const. Lim. 479 ; *Booth v. Woodbury*, 5 Am. Law Reg. (N. S.) 202 ; 21 Pa. St. 168 ; *Knowlton v. Supervisors, &c.*, 9 Wis. 418 ; *Brodhead v. Milwaukee*, id. 652, 665. This railroad company is a private corporation (*Powers v. Bears*, 12 Wis. 221 ; Redf. on R. W. 53, 54, and note 7 ; TRACY, Senator, in *Bloodgood v. M. & H. R. R. Co.*, 18 Wend. 59), and money cannot be

raised by taxation to be given to such a corporation. *Phil. Association v. Wood*, 39 Pa. St. 73; see also the remarks of COLE, J., in *Newell v. Smith*, 15 Wis. 104, 105, and note by Judge REDFIELD to *Todd v. Austin*, Am. Law Reg. Jan. 1869, p. 19. The fact that a majority of the electors of Fond du Lac county voted in favor of imposing this tax is immaterial. If the legislature can levy this tax with the consent of a majority of the people, it can do so without that consent. *Town of Guilford v. Chenango Co.*, 3 Kern. 143. 3. Taxation in this state is required to be uniform. If this tax is imposed on the ground of a local benefit, the taxing district is too broad, since it includes the residents of several towns which will be injured rather than benefited by the road. A still more serious objection to the law is, that it taxes all classes of people for the benefit of those who have wheat to send to market. *Cypress Pond Draining Co. v. Hooper*, 2 Met. (Ky.) 354; *City of Covington v. Southgate*, 15 B. Mon. 498; *Morford v. Unger*, 8 Iowa, 82; *Langworthy v. Dubuque*, 13 id. 86; *Fulton v. Davenport*, 17 id. 404; *Buell v. Ball*, 20 id. 282; *Tyson v. School Directors*, 51 Pa. St. 9; *Freeland v. Hastings*, 10 Allen, 575; *Merrick v. Amherst*, 12 id. 504; Cooley's Const. Lim. 494.

*Conger v. Sloan*, on the same side, argued, among other things, 1. That the only solid ground upon which the distinction between a public and a private purpose, in the use of money raised by taxation, can rest is, that in the one case the title to the thing constructed or acquired with the money vests in the public, and in the other it vests in an individual or private corporation. We admit that money may be raised by taxation by a municipal corporation, if authorized by the legislature, to build a railroad, and we do not see why it might not also be so raised to operate a horse railroad, a line of stages, a bank, a store, a hotel, a mill, or a mechanic's shop, to be owned by the municipal corporation. But we deny that money can be so raised to build or operate any of

these things for an individual or a private corporation. Yet the *incidental* benefit to the public would be the same whether any of these enterprises were owned and conducted by the municipal corporation or by a private · corporation. The only difference would be, that in the one case the *direct* benefits (that is, the profits, if any) would go to the tax payers whose money is taken; and in the other they would not. No court has gone to the length of holding that money raised by taxation can be donated to a private corporation. The decision in *Sharpless v. The Mayor*, etc., is distinctly placed upon the ground that the municipal corporation obtains title to that portion of the road constructed with the money raised by taxation. 2. If a municipal corporation could raise money by taxation, to be paid to a private corporation, to provide for constructing and operating a railroad, there must be some guaranty that the road will be operated. This act only provides for the grading of the road. A railroad which is only graded can be of no use to the public. The act, therefore, falls short of securing any public benefit whatever, and is void.

On the motion for a rehearing, the question of legislative power was re-argued by the several counsel.

*J. A. Bentley* and *Matt. H. Carpenter*, for the motion: · If the building of a railroad be not a matter of public importance and benefit, .the right of eminent domain, which, by the constitution of the United States and by that of every state in the union, is confined to the taking of private property *for the public use*, could never have been exercised in favor of such work. Fortunately for the progress of our country, the opposite view was taken in all·courts and places, until it came to be a part of the settled law of the land. The express language of the constitution limits the exercise of the right of eminent domain to the taking for a public use; and there is no such express limitation upon the taxing power, though

it is conceded that it *ought not* to be exercised for any other purpose.   To say that an express limitation upon the power of the legislature is less entitled to favor in the courts, than one which they deduce from general principles of natural justice, is to say that all written constitutions are not only useless but absolutely pernicious.   Counsel then cited and commented upon the following cases as establishing the doctrine that the construction of a railroad is a public use for which private property may be taken by the government: *Beekman v. S. & S. R. R. Co.*, 3 Paige, 45; *Bloodgood v. M. & H. R. R. Co.*, 18 Wend. 1; *Pratt v. Brown*, 3 Wis. 612; *Robbins v. R. R. Co.*, 6 id. 636.   2. Can the legislature authorize a county to build a railroad, or contribute toward the building of one, by direct payment of money? While the powers of the general government must be sought in express words of grant, or reasonably implied from what is expressly granted, the states have all the powers of sovereignty not denied to them by their respective constitutions.   In inquiring whether a given statute passed by a state legislature is constitutional, it is for those who question its validity to show that it is forbidden.   *People v. Draper*, 15 N. Y. 543; *Thorp v. R. R. Co.*, 27 Vt. 142; *Town of Guilford v. Chenango Co.*, 13 N. Y. 145; *Leggett v. Hunter*, 19 id. 445; *Cochran v. Van Surlay*, 20 Wend. 365; *People v. Morrell*, 21 id. 563; *Taylor v. Porter*, 4 Hill, 141; *Sears v. Cottrell*, 5 Mich. 251; *Mason v. Wait*, 4 Scam. 134.   Our state constitution contains provisions which regulate the mode of exercising the power of taxation, but contains no limitation upon the power (*Blanding v. Burr*, 13 Cal. 343), and courts have no right to impose such limitations. *People v. Brooklyn*, 4 N. Y. 428; *Wynehamer v. The People*, 13 id. 429; *People v. Draper*, 15 id. 532; *People v. Mahany*, 13 Mich. 500; *Sharpless v. the Mayor, etc.*, 21 Pa. St. 147; Cooley's Const. Lim. 168, cases cited in note (*a*).   But, not to insist upon this, it may be admitted that a tax for an object in which the public *have no*

*possible interest* is unconstitutional, and may be declared void for that reason by the courts. But as to what is meant by the public interest, see Cooley's Const. Lim. 488. "To justify a court in arresting the [tax] proceedings, and declaring the tax void, the absence of *all possible* public interest in the purposes for which the funds are raised must be clear and palpable, so clear and palpable as to be perceptible by every mind at the first blush." *Brodhead v. Milwaukee*, 19 Wis. 652 ; see also *Soens v. Racine*, 10 id. 271 ; *Hasbrouck v. Milwaukee*, 13 id. 43 ; *Booth v. Woodbury*, 32 Conn. 128. The principles affirmed in these cases must be entirely overruled before the act here in question can be pronounced unconstitutional by the court. 3. It is of no consequence whether the money raised by taxation is to be paid to a public or a private corporation, or to an individual. In the case of eminent domain, the state may take the land itself, or it may authorize a public or private corporation or an individual to take it ; provided always that it be taken *for a public use.* When a corporation or individual is empowered to take the property, it is the state that takes it, and the corporation or individual is the mere agent of the state for that purpose. All the turnpike roads of the eastern states, when turnpikes held to the interests of commerce the same relation now held by railroads, were built by this joint effort of the public and of individuals. In almost every instance, the turnpike company was authorized to take a highway which had been built by taxtion on land condemned by the public through the right of eminent domain ; and in some cases the public was taxed to aid in building the road for the company. *Couch v. Ulster Turnpike Co.*, 4 Johns. Ch. 26 ; *Turnpike Co. v. Bishop*, 11 Vt. 198 ; *Turnpike Co. v. Baker*, 4 Humph. 415. 4. The fact that the money to be raised here is to be donated, and that the county does not become a stockholder in the company, is immaterial. The language of the court in *Brodhead v. Milwaukee* and in *Hasbrouck v. Milwaukee* cannot be reconciled

with the idea that the county must be a stockholder in the railroad company, in order to justify the tax. To hold this idea is to base the right of the legislature to impose taxes in aid of railroads, not upon the substantial benefits to be realized, but upon a mere fiction, utterly barren of practical benefit to the people; since it is well known that not a dollar was ever realized by any town or county in Wisconsin as a dividend on stocks. No case can be found which holds the tax valid upon the ground of the stock, nor one which even mentions the stock as important; but every case rests the validity of the tax upon the ground that it is raised for the purpose of aiding a great public improvement. The only cases which mention the taking of stock at all (besides *Sweet v. Hulbert*, 51 Barb. 316) are, *City of Bridgeport v. Housatonic R. R. Co.*, 15 Conn. 475; *State of Iowa v. County Judge of Wapello*, 9 Iowa, 288; and *Gibbons v. R. R. Co.* 36 Ala. 410; and in these, the taking of the stock is considered either as of no consequence in supporting the tax, or as an *objection* to its validity. In *Sweet v. Hulbert*, the objection taken to the tax is, that no equivalent, real or imaginary, is contemplated by the act, or none certainly secured, before the issue and delivery of the bonds; an objection which does not apply here.

5. It is a mistake to say, that a railroad company is as independent of the government in the right to carry on its business, the use of its property, etc., as an individual would be. Such a company, from first to last, is a creature of the law, an agent of the state, exercising sovereign franchises, subject to the public will; and in this state its charter may be repealed at the pleasure of the legislature. *State v. Railroad Co.*, 25 Vt. 442; *R. R. Co. v. Chappell*, 1 Rice (S. C.) 383; *Beekman v. R. R. Co.*, 3 Paige, 74, 75; *Queen v. Eastern Counties R. R. Co.*, 10 Ad. & E. 531; *State v. R. R.*, 29 Conn. 538; *Kean v. Johnston*, 1 Stockt. 401; *Bagshaw v. E. U. Railway Co.*, 7 Hare, 114; *G. N. Railway Co. v. Eastern Counties Railway Co.*, 9 id. 306; *Works v.*

*Junction R. R.*, 5 McLean, 425 ; *Worcester v. R. R.*, 4 Met. 566 ; *King v. Severn Railway*, 2 Barn. & Ald. 646 ; Walford on R. W. 298, 299 ; Angell on Highways, 1, 18, 370. All railroads are post roads by act of congress. Brightly's Dig. 767, § 55, and 769, § 71 ; R. S. Wis., ch. 79, §§ 27, 43 ; Laws of 1859, ch. 58. The states have always granted to railroads right of way through the public lands ; and congress has, for years, granted land to the states in aid of railroads. If the view here controverted is true, all such grants must be condemned.

*Conger & Sloan*, for the plaintiff :

It is said that the power of eminent domain can be exercised only when the property is taken for a public use. And it is *assumed* that the same public use which will authorize a right of way to be taken under the power of eminent domain, will also authorize money to be raised by taxation and paid over to any individual or private corporation in whose favor the power of eminent domain can be exercised. But these two branches of sovereign power are distinct, and proceed upon different principles. The one takes specific property for public use, but awards full compensation. The other is defined to be a rate or sum of money assessed on the person or property of a citizen by government, for the use of the nation or state. Burrill's Law Dic. We apprehend that an important distinction between these powers is, that property taken by the power of eminent domain may be taken for the use of *the persons who compose the public, in their individual capacity*. Such is the case when the right of way is taken for a railroad, or when land is taken to create water power for a mill, or for a turnpike. In none of these cases has the government of the state any connection or concern beyond the act of delegating the power of eminent domain to the individuals or private corporations engaged in these enterprises. On the other hand, money raised by taxation is taken *for the use of the state or nation in its organized political capacity*

*as a government.* It results from this distinction that property might well be taken under the power of eminent domain, which would remain the subject of a perpetual use by the individuals who compose the public as the people of a state, although the title be transferred to a private corporation. It would in such a case be a matter of comparative insignificance to the owner of the property taken, whether the title went to the government or to a private corporation, as in either case full compensation must be made before it can be taken. And it would be of as little importance to the people generally, as the use for which it would be taken and held would be secured to them equally in either case, for the moment such use ceased, it would revert to the original owner. But the use of *money* raised by taxation consists wholly in its exchangeable value or purchasing power; and it can only be exacted by the state or nation to defray *the public charges.* In other words, the state takes money from individuals as their share of the public burdens. And it is an inexact use of language to say that money raised by taxation is taken *for the public use,* without distinguishing between a use by the people in their individual capacity as citizens, and a use by the government in its organized capacity. The legislature can raise money by taxation without limit for the use of the government of the state, or to discharge the burdens resting upon it ; but it cannot raise money by taxation for the use of, or to discharge the burdens resting upon, the persons who compose the public, in their individual capacity as citizens. It is this distinction which makes the boundary between the power of eminent domain and that of taxation.

It is true that there is no express constitutional prohibition upon the exercise of the power of taxation here claimed. The reason undoubtedly is, that while history furnishes many examples of the rapacious conduct of governments in taking the property of citizens for their own purposes without compensation, no government

of any civilized country, however despotic, had ever claimed, or attempted to exercise, the right to take, without compensation, the property of one class of citizens and give it to another.    In these latter days the attempt has sometimes been made, as this case shows ; but, whenever it has been made, courts have everywhere held that no such power has been granted to the legislative branch of government, and that all acts having such an object in view were wholly void ; and the prohibition is as imperative as though found in the express provisions of the constitution.

*Bennett & Norcross*, on the same side, argued, among other things, that even the right of eminent domain cannot be exercised except when a public *exigency or necessity* requires it; and, therefore, it can be exercised in behalf of railroads only to secure a right of way, and not by permitting them to take land for car factories, or to seize timber, iron, etc., for the construction of the road ; and still less can the taking of the money of citizens for the use of private railroad corporations be justified.    In support of these views they cited *Jordan v. Woodward*, 40 Me. 317 ; *Eldridge v. Smith*, 34 Vt. 484 ; *Lance's Appeal*, 55 Pa. St. 16 ; *West River Bridge Co. v. Dix*, 6 How. (U. S.) 545, 546 ; *Gordon v. Railway Co.*, 2 Railway Cas. 809.    To the point that the power of taxation can be exercised only to compel each man to meet his share of some public burden, and not in every case where the public has some interest, or may have derived some possible benefit, they cited *Freeland v. Hastings*, 10 Allen, 575 ; *Philadelphia Association v. Wood*, 39 Pa. St. 82 ; *Tyson v. School Directors*, 51 id. 9 ; *Curtis v. Whipple*, 24 Wis. 350 ; *Sweet v. Hulbert*, 51 Barb. 316 ; *Hansen v. Vernon*, Sup. Ct. of Iowa, 3 Western Jurist, 134.

The following opinion was filed at the June term, 1869 :

Dixon, C. J.    These are two appeals in the same action, the one by the plaintiff from a final judgment

dismissing his complaint, and the other by the defendants from a previous order of the court denying their motion to dissolve and vacate a preliminary injunction which had been granted in the cause on the application of the plaintiff. The question involved in these appeals is the same as that discussed in the recent case of *Curtis v. Whipple* (24 Wis. 350), and after what was there said in relation to it, a very lengthy examination will not be necessary. The question is as to the power of the legislature to raise money, or to authorize it to be raised, by taxation, for the purpose of donating it to a private corporation. We there held that the legislature possessed no such power, and the conclusion in that case we think follows inevitably in this, from the principles stated in the opinion. The cases are not distinguishable, except in the single circumstance that the corporation here, to which it is proposed to give the money, is a railroad company in behalf of which the power of eminent domain has been exercised by the state for the purpose of enabling it to secure the land over which to build its road. It is contended that this circumstance so completely separates the cases as to render wholly inapplicable to a railroad company a fundamental principle with regard to the power of taxation, which controls as to all other private corporations, and prohibits the making of similar donations to them — in other words, that it changes the corporate character of such company, and transforms it from a private into an altogether public corporation, so that the people may be taxed for the purpose of giving the money directly to it. If this position were correct, then undoubtedly the deduction would be that the taxation is valid. But we deny the correctness of the position, and, on the contrary, affirm that though a railroad company may be, as to its capacity to assume and exercise in the name of the state the power of eminent domain delegated to it, so far a public or *quasi* public corporation, yet in all its other powers, functions and capacities it is essentially a

private corporation, not distinguishable from any other of that name or character. As to the use of the land for the purpose of a highway, and the right of the public to pass and repass over it and enjoy the advantages afforded by it for the transporation of the merchandise and productions of the country from one place to another upon the payment of reasonable fare or charges, the corporation may perhaps be said to be public, but in all other respects it is private. The public having the power for itself to condemn the land on payment of just compensation, and to build, equip and operate the road, and to charge toll or fare for its use, or for the carriage and transportation of passengers and merchandise, that power, subject to the continued enjoy ment by the public as a matter of right, and not by per mission of the corporation only, of the same benefits of carriage and transportation upon the same conditions as to payment of fare and charges, may be exercised in behalf of a private corporation, and so far changes its character, but no farther. That such is the true corporate character of a railroad company is a proposition, we think, requiring very little argument or elucidation. It is plain to the mind of every intelligent person who has given the subject the slightest consideration. The road, with all its rolling stock, buildings, fixtures and other property pertaining to it, is private property, owned, operated and used by the company for the exclusive benefit and advantage of the stockholders. This constitutes a private corporation in the fullest sense of the term, and were we to attempt to distinguish between such a corporation and an incorporated institution of learning like that in *Curtis v. Whipple*, and to show that money might be raised by taxation to be given to the former, but not to the latter, it would be a task which we should despair of accomplishing to the satisfaction of any one not far more skilled in the subtleties of the law than we ourselves profess or ever expect to be.

And if we examine any book of authority on the sub-

ject, we shall find that such is and always has been the rule of the law as to the corporate character of such companies, notwithstanding the delegation of the power of eminent domain, and their consequent subjection in a certain degree to public use and convenience. They are always classed among private corporations, such as banking, insurance and manufacturing corporations, and corporations for the building of bridges, turnpikes, canals, etc. Messrs. Angell and Ames, in their work on corporations, section 40, expressly so classify them, and, speaking of them in connection with those last above named, say : "The latter kind have a concern with some of the expensive duties of the state, the trouble and charge of which are undertaken and defrayed by them in consideration of a certain emolument allowed to their members." As a matter of law, the duties of railroad companies to receive and carry passengers and goods differ very slightly, if at all, from those of other common carriers of passengers and goods, whether private individuals or copartnerships, or incorporated bodies. All common carriers are bound to receive and carry when paid or tendered a reasonable compensation. The public use and convenience is the same with one class of common carriers as with another—the same with an incorporated stage coach or steamboat company as with a railroad company ; and yet no one, we think, would pretend that taxation could be resorted to for the purpose of aiding the former, while all the property, gains and emoluments belong to the individual stockholders. All private corporations are more or less for public use. If they were considered of no public utility or advantage, it is presumed they would never be chartered. It enters into the very definition of a private corporation, that given in *Bonaparte v. The Camden and Amboy Railroad Company* (1 Bald. C. C. 223), that they are ·for the public use and convenience. Mr. Justice BALDWIN says : "Private corporations are for banks, insurance, roads, canals, bridges, etc., where the stock is owned

by individuals, *but their use may be public.*"   And Messrs. Angell and Ames, section 31, after quoting this language, add : " In all the last-named, and other like corporations, the acts done by them are done with a view to their own interest, and if thereby they incidentally promote that of the public, it cannot be reasonably supposed they do it from any spirit of liberality they have beyond that of their fellow citizens.   *Both the property and sole object of every such corporation are essentially private,* and from them the individuals composing the company corporate are to derive profit."

But a railroad company, like a company for running stage coaches or steamboats, might be incorporated, and the road built, equipped and operated, the public use and convenience being the same, without the delegation of the power of eminent domain.   Money will secure the title to land, over which to build a road, by contract with the owners, and it is a matter of policy on the part of the state whether it will delegate the power of eminent domain or not.   If a road were built and operated by such a company, could money be raised by taxation for the purpose of giving it to the company ?   Or if a railroad were built by one or more individuals, without any act of incorporation, and without the exercise of the power of eminent domain, as it is conceived might be done, could the people be taxed in order to give the money to such individual or individuals ?   Can a railroad be built and put in running order by direct taxation, and then the whole property transferred by act of the legislature, without compensation or equivalent, to one or more private individuals, or to a corporation composed of such individuals, created for the purpose of receiving it ?   Or can a corporation, composed of one or more individuals, be created for the purpose of owning and operating a railroad, and holding and enjoying all its gains and emoluments, and at the same time the charter provide that the corporators or stockholders shall pay nothing, but that the road shall be built,

equipped and put in running order at the expense of the people, to be defrayed by taxation? The majority of this court are constrained to believe that the legislature possesses no such powers, and that all these questions must be answered in the negative. Such proceedings, provided they were proper or could be sustained, would deserve the opprobrious epithet given to them by Judge JAMES, in *Sweet v. Hulbert,* 51 Barb. 316, where, speaking of an act of the legislature of New York, precisely like that involved in these appeals, he says: "If this can be done, it is legal robbery; less respectable than highway robbery, in this, that the perpetrator of the latter assumes the danger and infamy of the act, while this act has the shield of legislative irresponsibility."

If, as we have supposed, the granting of the right of eminent domain to a railroad company may so far change its corporate character as to clothe it with the power of the state, and, in consideration of the emoluments allowed to its members, charge it with the performance of a duty of the state, namely, that of providing suitable and proper thoroughfares through it for the benefit and convenience of the people, we have still endeavored to show that the character of the company remains in every other respect the same as if no such grant had been made. Nor is this mixed public and private character of the company any thing strange or anomalous in the law of corporations. It is well known, for example, that a state may take upon itself the character of a private citizen or corporation, by becoming a partner or stockholder in a private trading company or corporation, and that public and municipal corporations may stand in respect to some things, as grants made to them by the state or under its authority, on the same footing as would any individual or private corporation, upon whom a like special franchise may have been conferred. Angell and Ames on Corp., §§ 31, 32, 33, and cases cited. Our conclusion, therefore, is, that though a railroad company may pos-

sess this single exceptional corporate characteristic, it is, nevertheless, essentially a private corporation, coming fully within the operation of the principles laid down in *Curtis v. Whipple*, and that the taxation complained of cannot be sustained. This conclusion is fully supported by the case of *Hansen v. Vernon*, as yet unreported, in the supreme court of Iowa, December term, 1868, and the case of *Sweet v. Hulbert*, above referred to, which are the only cases known to us where the question here presented has been directly raised and decided by the courts. The opinions in both cases are very able, and clearly and fully sustain the position taken by counsel in the able arguments made at the bar in this case.

It only remains for us to add a few words, if, indeed, the same can be thought necessary, by way of distinguishing between this and those numerous cases where it has been held that cities, towns and counties can subscribe for the stock in a railroad company, and discharge the debt thus incurred by the assessment and levy of taxes. The principle upon which such taxation has been sustained will readily appear by a reference to the opinion in *Curtis v. Whipple*. The city, town or county becomes a part owner of the road, to the extent of the stock taken, and the work being one which the public might have engaged in as the sole owner, and paid for entirely out of the public funds, it has been considered that there was no valid objection to its becoming a part owner thereof as a stockholder in a private corporation which has undertaken to do the same work. To the extent of the stock taken, the city, town or county is directly interested and benefited by the money expended in the work, the same being a matter of public concern, and it is, in our judgment, upon this principle, and this alone, that the taxation in that class of cases can be sustained. In saying this, we, of course, do not intend to exclude the idea, found in all the cases, that the road must be one situated within or passing through the corporate limits of the municipality to be taxed, and so

promoting the general prosperity and welfare of the people who are to pay the taxes. Cooley's Constitutional Limitations, 214, and cases cited. The two things must unquestionably concur, in order to sustain the tax, but the last alone, which may be termed the benefit incidentally arising to the public, is clearly insufficient for the purpose. The property in the road having, by the creation of the corporation and the franchises granted to it, been converted into private property, devoted exclusively to the gains and emolument of the individual stockholders, the incidental benefits accruing to the public by reason of the investment, can no more sustain a tax than the like incidental benefits arising to the public from the employment of the capital or labor of the citizens in any other business or enterprise of a purely private character. For, if such incidental public benefits or advantages alone will support a tax for a donation of money to persons or corporations engaged in one kind of private business, then they certainly must in another, and if it should be shown, as it undoubtedly can in numerous towns and places, that the establishment of mills and manufactories would be greatly beneficial to the inhabitants, far more so, perhaps, than the building of a railroad, then it would follow that the people of such towns and places could be taxed for the purpose of giving the money to persons or corporations proposing to build such mills or manufactories. This last is a proposition upon which no one will insist; and we are clearly convinced that that contended for in this case is equally untenable.

COLE, J.  I fully concur in the opinion of the chief justice given in the above causes.

*By the Court.*—The order and direction of this court is as follows :

1. The judgment appealed from is reversed, and the cause remanded for further proceedings in accordance with this opinion.

2. The order refusing to vacate or dissolve the temporary injunction is affirmed.

The defendants moved for a rehearing, and the appeals were finally disposed of at the January term, 1870.

DIXON, C. J.    The arguments on this motion for a rehearing have been most thorough and able, and if this court is still in error upon the question involved, it can certainly never be said that it was any fault of counsel. For the power of taxation here claimed, and against our decision with respect to it, the argument has taken a wide range, and nothing seems to have been omitted which could, by possibility, give strength to the position of the learned counsel on that side, or show the views of the court to have been erroneous. The authorities have been cited almost to the end of the list of those supposed to sustain the position of the counsel, and quotations have been extensively made from them, while no pains have been spared to elucidate and apply them to the case in hand, with all that learning and ability for which the counsel are so justly distinguished. With time for the investigation, so as not to interfere with the performance of other duties, we have endeavored to profit by those labors of counsel, and have given the question that careful and patient study and consideration which its importance demands. We are now prepared to restate our views, and more especially with reference to the positions taken by counsel in support of this motion, more fully and at large than on the former occasion.

And first, as to the cases in this court, from the opinions in which counsel quote so largely, and upon which they rely so confidently, it seems hardly necessary to add to our former remarks. Those cases are as clearly distinguishable from this as ever one case was from another. They were all cases of taxation for the direct and immediate benefit of the public — to improve a harbor, which was public property — to save from

destruction the streets and site of a populous town, also
public property — and to secure soldiers to protect and
defend the country in time of war, always recognized as
a public object of the greatest magnitude and import-
ance.   With these objects in view, it seems very strange
that the language of the court should be severed entirely
from the facts of the case before it, and the attempt be
made to apply it to a wholly different state of facts,
where the object of the tax is to promote a strictly indi-
vidual enterprise and to add to or enhance the value of
merely private property.   And particularly does this
seem strange when the power to tax for any private pur-
pose was expressly denied in the opinions.   Such mode
of interpreting and applying judicial opinions is well
known to be unauthorized.   It is a mode of misconstru-
ing them, against which, when counsel are so disposed,
it is impossible for any court to guard or protect itself.
When, therefore, it was said in those cases that any,
the slightest, public interest or benefit would sustain a
tax, such statement is to be considered in connection
with the facts of the case upon which it was made, and
when it appears, from those facts, that the interest or
benefit spoken of was the direct and immediate interest
or benefit of the public to be promoted by the work,
and not such as would incidentally or remotely accrue
to the community at large from the accomplishment of
it, it is to such direct and immediate public benefit and
interest that the statement is to be applied, as much as
if it had been expressly so limited.   This is a familiar
rule of construction, and one which cannot be departed
from by counsel with safety to suitors or with justice to
the court.   It is a rule which excludes all such unfounded
inferences as that attempted to be drawn here.   The
court in those cases being called upon to define what
direct and immediate public interest or benefit would
sustain a tax, did so in the language quoted.   The ques-
tion whether a public benefit or interest of some different
kind, as that which is indirect or incidental to the pros-

ecution of some enterprise or business of a private character, would sustain a tax, was not then before the court, nor was the court required to consider it or to expressly qualify its language with reference to it. The language of the opinions, and every word in them, stand qualified and limited by the proper subject-matter of the cases under consideration, and, thus understood, we have nothing to add to or take from them, and acknowledge our obligations when the learned counsel commend them as perfectly sound expositions of the law. We, too, belive them to be correct, and not in the smallest degree inconsistent with what has been here decided.

Again, it is said that every case in which the exercise of the power of eminent domain in behalf of one of these private railroad companies has been upheld is an authority clear and positive against the decision now made. The correctness of this conclusion depends upon the correctness of the premises from which it proceeds. It is assumed, as the foundation, that that which is a public use so as to justify the exercise of the power of eminent domain is also a public use which will, under all circumstances, justify the exercise of the power of taxation. It is assumed that no difference exists in public uses, but that all are alike, and that a public use once established, with respect to one of these powers, is necessarily a public use with respect to the other. And this we think to be the great mistake upon this point. It arises from considering two things alike which are in reality different. It ignores all distinction between different public uses, and the effect which such differences may have in determining the legislative authority. That public uses differ very widely from each other is a proposition which no one can deny. They differ in nature and kind, and in the degree or extent of the public enjoyment. There may be various degrees of the same kind of public use. It may be more extensive and complete in one case than in another. Certain uses are

*per se* public, such as of public highways, public build-
ings, and the channels of public rivers.    Others have
been declared public by the decisions of the courts, as
of railroads, turnpike roads, public ferries, toll bridges
and the like. . But these last have as yet been declared
public only with respect to the power of eminent domain.
Now, as there exists this variety and difference of public
uses, the question arises whether, in the case of this rail-
road company, a distinction is to be taken between a
public use which will authorize the exercise of the power
of eminent domain, and one which will justify a resort
to the power of taxation to promote the same object.
And we think that there is such distinction.    These
powers are not identical, though both must be exercised
for a public purpose, or not at all.    There are many
public uses for which taxes may be levied that have not
as yet been held to authorize the condemnation of private
property, though suitable or convenient for the same
public uses.    Taxes may be levied to build a state capi-
tol, court-houses, public school buildings, jails, a state
prison, an asylum for the insane, etc., but recourse to
the power of eminent domain to obtain the land upon
which to erect such buildings would be something new
in the legislative and judicial proceedings of this country.
"Who ever heard," says Mr. Justice WOODBURY, in
*West River Bridge Company v. Dix* (6 How. [U. S.]
546), "of laws to condemn private property for public
use, for a marine hospital or state prison?   So a custom-
house is a public use for the general government, and a
court-house or jail for a state.    But it would be difficult
to find precedent or argument to justify taking private
property, without consent, to erect them on, though
appropriate for the purpose."    But it may be said that
this difference only exists by reason of the greater public
necessity required to justify the exercise of the power
of eminent domain, and that it shows that the power of
taxation is the more general and extensive of the two.
Be it so.    We only refer to it for the purpose of showing

that such difference does or may exist in particular cases, and, when that is shown, the fact that there may be other differences in other cases, and which may lead to other conclusions, seems altogether less improbable.

As has already been said, we think there exists a difference here, and that it is such that, though the power of eminent domain may be exercised, yet the power of taxation, as here claimed, cannot be. And in order to understand this, it will be necessary to precisely ascertain and define the nature and extent of that public use which, in the case of these private railroad companies, has been held sufficient to authorize the exercise of the power of eminent domain in their behalf. And first, let us rid the question of some considerations which, for want of proper care and attention, have too often been most erroneously supposed to enter into it. Of such considerations, the principal and most important one is that the public use which justifies the exercise of the power, in some way consists in the general benefits and advantages accruing to the public at large from the creation and operation of these works of internal improvement. It is very clear that the public use does not in any manner consist of these, for if it did, then every enterprise or business prosecuted for private gain or emolument, and by which the public prosperity and welfare is also promoted, would be a public use, and, as such, would justify the exercise of the power of eminent domain in behalf of the persons and corporations so engaged, and, according to the doctrine of those who differ from us in opinion, likewise the power of taxation, to donate money and property to such persons and corporations. There are very many enterprises and occupations of a private character, connected with trade, commerce and manufactures, which are quite as much to our advantage as a people, and quite as necessary and indispensable to our growth and prosperity as a nation, as the building and operating of railroads, and some are even more so. Senator Maison, in that part of his opin-

ion quoted by counsel in support of this motion, after dilating upon the great public advantages afforded by the introduction of railroads, says : "Next to the moral lever power of the press should be ranked the beneficial influence of railroads in their effects upon the vast and increasing business relations of the nation, and the promoting, sustaining and perpetuating of the happiness, prosperity and liberty of the people." *Bloodgood v. M & H. R. R. Co.*, 18 Wend. 48.

Here then we have, in the leading authority cited and relied upon by the learned counsel, the admission, the truth of which no one can dispute, that there are private business occupations in which the people at large are more deeply interested, and by which they are more greatly benefited, than by the building and operating of railroads, and if the benefits and advantages accruing to the public from the latter, while in the hands of private corporations, and used and operated for the sole gain and emolument of the stockholders, constitute a public use which will justify a resort to the power of taxation for the sake of giving the money to such corporations, who shall say that the benefits and advantages derived by the public from the former will not sustain the same proceedings, in order to donate the funds to the persons or corporations whose time and capital are thus beneficially employed therein ? Who shall say that the power of eminent domain may not be exercised, and taxes levied for the encouragement and support of the newspaper and periodical press of the country ? Who shall say that donations and benevolences, drawn from the pockets of the people by taxation, may be given to the champions of the New York and Erie railroad, and that they may not be given to the Harpers or the Appletons ? Who shall set Franklin square against Wall street, and claim that taxes may be levied to give to the latter but not to the former ? The majority of this court has decided that, upon considerations like these, taxaation cannot be resorted to for either purpose, and to that

decision it is proposed to adhere until some more satis-
factory ground for discrimination can be shown than has
yet been made to appear. It is obvious, if public bene-
fits and advantages of this kind, and which may be
properly called incidental, constitute a public use which
will justify a resort to either of these sovereign powers
of government, that then all distinction between public
and private business, and public and private purposes,
is obliterated, and the door to taxation is opened wide
for every conceivable object by which the public interest
and welfare may be directly or in any wise promoted.
Such a doctrine would be subversive to all just ideas of
the powers of government and destructive of all rights
of private property, leaving every man's estate to be held
by him as a mere grace or favor received at the hands of
the legislative body. And such is the consequence of
looking to these incidental public benefits and advanta-
ges as *the* public use which will justify the exercise of
these high governmental powers; and those gentlemen
who, like Senator Maison and others, have in words of
studied eloquence labored to depict such benefits and
advantages, thinking that they were thereby demonstrat-
ing that such legislation was justifiable, were never more
mistaken. The same eulogies might, and with equal or
more truth, be applied to the press, to domestic manu-
factures and to many other things, by which the general
happiness and prosperity of the people have been equally
or more greatly promoted.

The incidental public benefits or advantages, though
in a general sense to be considered, do not, therefore,
constitute in the sense of the law a public use, which
will justify the interference of the government; and
the question is, in what does such use consist in the
case of these railroads owned and operated by private
corporations? We have seen that certain uses are
*per se* public, and that others have been pronounced
so by the courts, and, among the latter, railroads.
Eminent domain is the right of the government to

seize private property for public use, upon payment of just compensation to the owner. It is a power which must be exercised by the government or sovereign, and for the public use only. It cannot be delegated. "The *public use*," says Judge COOLEY, in his excellent treatise on Constitutional Limitations, 531, "implies a possession, occupation and enjoyment of the land by the public, or public agencies." And further on, in commenting upon the same subject, Judge COOLEY notices the broad language of Chancellor WALWORTH, in *Beekman v. Saratoga & Schenectady R. R. Co.* (3 Paige, 73), and which is quoted and made emphatic by counsel here, that, "if the public interest can be in any way promoted by the taking of private property," the taking can be considered for a public use. He observes, what must be obvious to every one who has thoroughly considered the subject, that it would not be safe to apply with much liberality this language of the learned chancellor. We refer to this definition of that learned writer, as being the most clear, concise and correct general definition of what constitutes the public use which justifies the exercise of the power of eminent domain that has anywhere fallen under our observation. It appears, then, that the *public use* consists in the *possession, occupation and enjoyment of the land itself by the public, or public agencies*, and not in any incidental benefits or advantages which may accrue to the public from enterprises of this nature. But the question before us calls for a more precise definition as to how it is that the public may be said to possess, occupy and enjoy the land condemned for the use of these railroad companies. And here again we must refer to the opinion of Mr. Justice WOODBURY, whose clear ideas and firm grasp of legal truths seem never once to have forsaken him. In the case first above cited, after speaking of certain uses which could not be deemed public, so as to justify the application of the principle of eminent domain, and specifying some of those things which are necessary

to constitute a public use of a toll bridge, turnpike, or railroad, he says, in addition, that it *"must be under public regulations as to tolls, or owned, or subject to be owned, by the state,* in order to make the corporation and object public, for a purpose like this." And, as was customary with him, he cites many authorities to the point, and then proceeds: "It is not enough that there is an act of incorporation for a bridge, or turnpike, or railroad, to make them public, so as to be able to take private property constitutionally, without the owner's consent; but their uses and objects, or interests, must be what has just been indicated — must, in their essence, and character, and liabilities, be public within the meaning of the term 'public use.' There may be a private bridge, as well as a private road, or private railroad, and this with or without an act of incorporation." And Chancellor WALWORTH, in *Beekman v. Saratoga R. R. Co.* (3 Paige, 75), likewise states the true nature of the public use, when he puts it on the ground that "the legislature may, *from time to time, regulate the use of the franchise, and limit the amount of toll which it shall be lawful to take,* in the same manner as they may regulate the amount of tolls to be taken at a ferry, or for grinding at a mill, unless they have deprived themselves of that power by a legislative contract with the owners of the road." And in the leading case of *Railroad Co. v. Chappell* (1 Rice, 398), cited by Judge WOOD-BURY, and likewise by counsel here, it is said that a railroad to be deemed a highway should be *kept under public control.* The public use, therefore, which has been held to justify the application of the doctrine of eminent domain in the case of these railroads owned and operated by private individuals, consists in the fact that the owners cannot, without reasonable excuse, refuse to receive and transport passengers and freight when offered at usual rates, and in the fact that *the state retains the power to regulate and control the franchise, and limit the amount of tolls which it shall be lawful for the*

*owners to charge.* The use consists in these facts, and these alone. And as a man may be said to possess and enjoy the estate of another, the use of which by that other he may regulate and control, so that it shall not be turned to his detriment or disadvantage, so the public, through this reserved power of the state, may be said to possess and enjoy the land condemned for use by these railroad companies. And this is the public use which has been held to justify the exercise of the power of eminent domain in behalf of such corporations, a power which, by the barrier erected by the constitution, requiring payment of full compensation to the owner, is far less susceptible of legislative abuse, and far less dangerous to private right, than the power of taxation.

And here it occurs to us to observe, that under the principles announced in the Dartmouth College case and in the numerous cases which have followed it in the same court, and by the authority of which the courts of all the states are bound, this power of the state to regulate and control the franchise and fix the amount of the tolls, and without which the public use cannot exist, has frequently been wholly lost. The doctrine of those cases, that the charters of such corporations are contracts between the state and the corporators or stockholders, and, as such, irrevocable and unchangeable at the will of the legislative body which granted them, unless the power to alter or repeal is expressly reserved, overturns entirely the principle upon which the power of eminent domain has often been exercised in behalf of corporations thus chartered and organized. It is totally inconsistent with the ground upon which that principle has been held to apply, that the power and control of the state, and consequent public use, should be thus extinguished; or that such power and control should be exhausted by the legislature having regulated the tolls or fixed the rates for carriage and transportation in the first instance ; or that it should be competent for the legislature, in any manner, or

by any contract with the corporation, or its promoters or stockholders, to part with its authority in the premises. A corporation of this kind, which is above the power and control of the state in these particulars, is not for the public use, so as to justify the exercise of eminent domain in its behalf; and it appears to us, that, as to every act of incorporation thus falling within the decisions of the federal supreme court, it should have been so held. It appears to us, also, in the passage above quoted, that Chancellor WALWORTH, eminent as he was for sound learning and judicial ability, was inconsistent in putting the public use which would authorize the application of the principle of eminent domain upon the ground that the legislature might, "from time to time, regulate the use of the franchise and limit the amount of toll which it should be lawful to take," and then admitting or supposing that the legislature might, by contract with the railroad company, deprive itself of that power. But be this matter as it may in other states, the question can never arise in this state. Our people, by a most wise and beneficent provision in their constitution, have perpetually reserved the power to the legislature to alter or repeal all charters or acts of incorporation at any time after their passage. Const. art. XI. sec. 1. In this state, therefore, the public have that use which has been held to justify the exercise of the power. The legislature, if it has not done so, may limit the tolls and fares to be received by this railroad company to a reasonable sum, beyond which the company shall not go. It may prevent abuses in that respect.

And now that we see precisely what this public use is, its character and extent, we are the better able to judge whether it will sustain the power of taxation here claimed. We see that it is not a public use *per se*, which all agree will support taxation, but far from it. It is not that free and unrestrained use which the public has of its own property, but a mere right, on the part

of the public, through the legislature, to control the franchise of the company, and regulate its use of the property belonging to it, so as to prevent oppression, and avoid the imposition of unreasonable and unjust burdens upon the people who are obliged to avail themselves of these great channels of trade and communication. In *The West River Bridge Company v. Dix*, above cited, a critical examination into the nature and extent of this public use became necessary, and the subject was most thoroughly and exhaustively canvassed and considered. The legislature of Vermont, conceiving that it might sometimes be expedient to convert the turnpike roads and toll bridges in that state into free roads and free bridges, passed an act authorizing the supreme and county courts to take any real estate, easement or franchise of any turnpike or other corporation, when, in their judgment, the public good required a public highway, and providing that compensation should be made in the same manner as in the case of highways laid out over individual or private property. ` Under that act, the franchise and property of the West River Bridge Company, a corporation created by the laws of that state, and whose charter had some sixty years to run, were seized for public use. The company resisted the proceeding on various grounds, all of which were overruled. The cause was argued for the company by Mr. Collamer and Mr. Webster, and on the other side by Mr. Phelps, the two latter being at that time senators of the United States. One objection urged against the proceeding was, that the property was already devoted to the public use, and that there could be no such thing as seizing it again for a public use of the very same kind.

In reply to this Mr. PHELPS said, (and we feel no hesitancy in quoting the language of so distinguished a lawyer, judge and statesman, though used in argument, especially when such argument was fully sustained by the decision of the court), speaking of the power of eminent domain: "But the question has been agitated

elsewhere, and may be started here, whether a franchise granted to private persons for their private emolument, and yet for a public use, is not beyond the reach of that power. These cases being of a *mixed character*, combining private right and emolument with public convenience, the question resolves itself into two others, viz: 1st. Are the private rights thus conferred of any superior sanctity? And, 2d. Does the *partial, qualified and limited appropriation of the property to public use* exclude the further exercise of the right of eminent domain?" And Mr. Justice McLean, said: "The use of this bridge, it is contended, is the same as before the act of appropriation. The public use the bridge now as before the act of appropriation. *But it was a toll bridge, and by the act it is made free. The use, therefore, is not the same.* The tax assessed on the citizens of the town to keep up and pay for the bridge may be impolitic or unjust; but that is not a matter for the consideration of this court." These references show very clearly the differences existing in public uses, and that the public use in the case of a railroad owned and operated by a private corporation is but a partial, qualified and limited one. It is qualified and limited by the private right which the railroad company has to ask and demand, of every person who uses its road, a reasonable fee or toll, which reasonable fee or toll may be fixed by act of the legislature. And in the case of the toll bridge which was made free by right of eminent domain, the taxes which the people paid to compensate the company for the franchise and property taken from it became a substitute for the tolls which had been theretofore paid. Before the act of appropriation the public could use the bridge only upon paying tribute to the company, but afterward it was free. *The proposition here is to compel the public to pay tribute and taxes too — to pay for the property, and yet not to own it — to pay for it, and yet pay the company for the privilege of using it.* Is there to be no discrimination upon different public

uses for these different purposes? Is the *partial, qualified and limited public use* which has been held sufficient to justify the exercise of the power of eminent domain in behalf of these private railroad companies, also to be held sufficient to justify the exercise of the power of taxation for the sole and immediate purpose of donating the moneys raised to such companies? If it is, then indeed are the proper objects of taxation greatly multiplied. The power of the legislature to regulate the tolls and charges of such companies is in itself a limited one, if not in a constitutional sense, certainly in the sense of morality and justice. If there be not an express, there is certainly an implied, obligation and promise on the part of the state never to reduce the tolls and charges below a standard which will be reasonable, or which will afford a fair and adequate remuneration and return upon the amount of capital actually invested. This obligation and promise, which spring from the act of incorporation and invitation by the state to persons to invest their money in the stock, it is presumed no legislative body would disregard, except where the company, by gross and wanton abuse of its privileges, had forfeited its rights, and then, instead of legislative action, it is also presumed that the regular course of judicial proceedings would ordinarily be preferred. The true intent and object of the power is, that the legislature shall be able to protect the rights and interests of the people, but not that it shall arbitrarily or unnecessarily impair the rights or franchises of the company, or destroy the property of its stockholders. The good faith of the state is pledged against this, and it is not within the range of presumption that it will ever be done. The individuals owning the property, and whom the corporation represents, purchase it under this pledge and inducement held out by the state. To them it is a matter of mere private business, engaged in under the sanction and encouragement of the state, and for their individual gain and emolument, and the

legislature will no more unnecessarily interfere with it, or with the business of the corporation where it is legitimately and properly conducted, than it will with any other private business.

As yet we believe the power has never been exercised with respect to any railroad company organized in this state, and possibly it may never be.  It is valuable, however, as a check upon the rapacity which these corporations sometimes exhibit, and the time may come when the legislature will be imperiously required to exert it; but when it does, if ever, it will not be to deprive the corporation or its stockholders of their legitimate rights, but to correct abuses and save the rights of the people. The legislature will not reduce the tolls or rates to an unreasonably low figure, or so as to disappoint the just expectations of the owners of stock.  It will not destroy the earnings of the road, or cut off satisfactory dividends upon the cash capital actually paid in, if the business of the company is such as to afford them.  In fine, it will hold the company only to the receipt of *reasonable* tolls, and this with a view to the nature and extent of its business, the expenses necessarily incurred by it, and the amount of capital invested.  The legislature will not cut down the tolls unreasonably with a view to compensating the loss of the company by taxing the community at large, for that would be to defeat the very principle upon which all these companies are organized and roads built.  That principle is, that those persons should pay for the building and operating of the roads, who use them, and as they use them.  They pay their taxes for these improvements when they pay their tolls.

Regarding the reserved power in this light, and as it in fact exists and will continue to exist, and considering that it constitutes the only legitimate basis of any public use which will justify the exercise of the power of taxation here contended for, we see at once, if the power be conceded, that there are other private business pursuits for the benefit of which, or of the persons engaged in

them, taxes may also be levied. All common carriers of passengers and goods are bound to receive and carry, unless some valid excuse be shown, when tendered a *reasonable compensation.* This is the right of the people at large — of all. It is compulsory by them, and not optional with the carrier. Angell on the Law of Carriers, §§ 124 to 129, and authorities cited. If this tax be valid, why may not the people be taxed to make donations to common carriers? And as all innkeepers stand upon the same footing with respect to the rights of the public and the sums which they may charge for entertainment, why may not taxes be levied for their benefit? But it may be said that the legislature has not the power to fix the sums which carriers shall charge. This is by no means certain. But if not to tax for common carriers, then certainly the power would exist to tax for the benefit of all owners of grist-mills throughout the country. In the case of a grist-mill, the private property of any person, there exists the same public use as in the case of a railroad. It differs from it in no respect whatever. The legislature may regulate and limit the tolls for grinding at its pleasure, and provide, as the legislature of this state has done, that the owner shall receive and grind the grists of others in preference to grinding his own grain. Laws of this character exist in every state of the union, as well in those where it has been held that the right of eminent domain cannot be exercised in behalf of mill owners, as in those where it has been held that it can. And in this state it is immaterial whether the head or power of water which propels the mill is created by flowing the lands of others, under the authority granted by the Mill Dam Act, or only by flowing the land belonging to the owner of the mill. The act applies to and regulates the tolls and manner of conducting the business in all grist-mills moved by water. R. S., ch. 60. When, therefore, the owner of a site and adequate mill power upon his own land became desirous of improving it by the erection

of a grist-mill, he might apply to the legislature for an act to tax his neighbors to furnish funds for that purpose, and such act would be valid; or, having erected his dam and built and put his mill in operation, he might from time to time afterward procure such taxation for his private or individual benefit; and no lawful objection could be taken thereto. For ourselves, we cannot think that this kind of public use, though it may sustain the power of eminent domain, will also sustain taxation like this; and we here end our remarks upon the point.

Again, it is said that the property in the hands of these railroad companies is public property, and therefore such taxation is justifiable. This proposition requires not much discussion. The contrary has been the settled law both in England and this country ever since these and kindred corporations, as plank-road companies, turnpike companies, toll-bridge companies, ferry companies, and the like, have had an existence, and for the earlier authorities to this point we refer to the citations in the brief of counsel in *Charles River Bridge v. Warren Bridge* (11 Peters, 433). Not only the property in the road, rolling stock, fixtures, and all buildings and appurtenances, is recognized and protected as the private property of the corporation, but also the franchise itself. It is subject to mortgage, lease and sale by the company, and may be seized and sold on execution against it. And, if it belonged to a natural person, it might also be bequeathed or disposed of by will. "A franchise," says Mr. Justice DANIEL, delivering the opinion of the court in *The West River Bridge Co. v. Dix, supra*, "is property and nothing more; it is incorporeal property, and so defined by Justice BLACKSTONE, when treating, in his second volume, chap. 3, page 20, of the rights of things. It is its character of property only which imparts to it value, and alone authorizes in individuals a right of action for invasions or disturbances of its enjoyment." And Mr. Justice McLEAN says, in the

same case: "*It is objected that this bridge, being owned by a corporation and used by the public, does not come within the designation of private property. All property, whether owned by an individual or individuals, a corporation aggregate or sole, is within the term. In short, all property, not public, is private.*" And, in the same case, Mr. Justice WOODBURY, speaking of the franchise, says: "It is also property, subject to be sold, sometimes even on execution, and may be devised or inherited." And further on he adds: "I concur, therefore, in the further views, that the corporation as a franchise, and all its powers as franchises, *both being property, may for these and like reasons, in proper cases, be taken for public use for a highway.*" And in *Thorpe v. R. & B. R. Co.* (27 Vt. 151), Chief Justice REDFIELD, in pronouncing the judgment of the court, says: "It is admitted that the essential franchise of a private corporation is recognized by the best authority as private property, and cannot be taken without compensation, even for public use." And on page 155, speaking of the case of *Swan v. Williamson* (2 Mich. 427), where it was denied that railways were private corporations, he says: "But that proposition is scarcely maintainable so far as the pecuniary interest is concerned. If the stock is owned by private persons, the corporation is private so far as the right of legislative control is concerned, however public the functions devolved upon it may be." To these authorities many others might be added, but it is deemed unnecessary. And the force of the language quoted and emphasized by counsel, from the opinion of Chief Justice SHAW, in *Inhabitants of Worcester v. The Western Railroad Corporation* (4 Met. 566), to the effect that the real and personal property there vested in the corporation was "in trust for the public," consists in concealing or losing sight of the facts of that particular case. The act of incorporation there was peculiar, and it appears in the very next paragraph of the opinion how that trust was created. And the doctrine of the isolated case of *Erie and North-*

*east Railroad Co. v. Casey* (26 Pa. St. 287), by a divided court, that, after the repeal of the charter of a railroad company, the property belonging to the corporation is public property, and that the state may take possession of and hold it, regardless of the rights of stockholders and of the creditors of the company, is so clearly in opposition to every other adjudication upon the subject, that it seems almost a waste of time to talk about it. This conclusion is as startling and unjust to the companies as the taxation here insisted upon is to the people. And the chief reason given for the decision seems quite as strange as the decision itself. It is, if the road be not held to be public property belonging absolutely to the state upon the repeal, that to repeal the charter would be to give the corporation a new and perpetual lease of life, emancipated from all legislative control and authority, and that it might continue to run the road and receive tolls at the mere pleasure of the stockholders. It is somewhat singular that it should not have occurred to the court, that the right to run a railroad, taking tolls or fares, is a franchise which no person or corporation can legally exercise without a special grant from the legislature. When the charter was repealed, this franchise was gone, and the owners' of the road could not thereafter operate it in defiance of law; and the property of the corporation was subject to disposition in the usual course of judicial proceedings, like that possessed by any other private corporation at the time of its dissolution. It would be repugnant to the constitution of the United States, as interpreted by the supreme court, to hold that the obligation of the contracts of such corporations could be impaired by the repeal of their charters. "The obligation of those contracts survives; and the creditors may enforce their claims against any property belonging to the corporation, which has not passed into the hands of *bona fide* purchasers, but is held in trust for the company, or for the stockholders thereof, at the time of its dissolution,

in any mode permitted by the local laws." *Mumma v. The Potomac Company*, 3 Pet. 286. See, also, *Curran v. State of Arkansas*, 15 How. 304, and cases cited.

A further argument in support of the power is, that a writ of *mandamus* will lie at the instance of the state to compel the company to build and operate its road, and that when the public have such an interest taxes may be levied. This seems to be a consideration of some importance; but, unfortunately for the argument, the English case cited and relied upon by counsel has been overruled, and it is now held in England, under charters very much more specific and stringent than any granted in this country, that there exists no obligation on the part of the company, either before or after entering upon the work, to complete it. 18 Eng. L. and Eq. 199, 211; 2 Redfield on Railways, § 192 and note 5. And in the case of *The People v. The Albany and Vermont Railroad Company* (24 N. Y. 261), it was held that no injunction could be granted at the suit of the people to prevent a railroad company from abandoning a portion of its road and removing the track; and although it was intimated that *mandamus* or indictment would lie, yet the whole reasoning of the court was against it. The writ has never yet been sustained in any case in this country, and Judge REDFIELD says, in the note above referred to, "that the later English decisions certainly conform to what has ever been regarded as the law upon that subject in this country." The court in that case say: "It is optional with the corporation whether it will exercise the powers bestowed, or undertake the work; and, being so, the grant and acceptance of the railroad franchise cannot properly be construed a contract between the state and corporation, binding the latter to construct and maintain the railroad for the public benefit. It is only from the charter and its acceptance that any contract relation between the state and the corporation can arise; and such contract must be operative, if at all, the moment the charter is accepted. The provisions of

the railroad act negative the idea that any contract relation between the state and the corporation formed under it springs out of the grant and acceptance of the franchise. There is, therefore, no contract obligation resting on the corporation brought into existence by the railroad act, in favor of the state or interested citizens, to construct, maintain and operate, for the public convenience and use, the road named in its articles of association. But is the duty specially declared, or necessarily to be implied from the provisions of the railroad act? There is no such duty specially declared. There are no express words of the act requiring the corporation created under it to make and maintain the roadway. Had there been, there probably would have been but few corporations formed under it. Nor do I think the duty can be clearly collected from the general purview of the whole statute. To promote the construction and maintenance of railroads to be publicly used in the conveyance of persons and property, is undoubtedly a purpose of the law. It invites capitalists into this field of enterprise, *not as public servants, charged with a public duty, but as private corporations*, whose privileges are to be exercised, if at all, under limitations and restrictions looking to the benefit of travelers and patrons of the work. The legislature, in effect, say, as the proposed road is to be of public utility, we empower you to build and operate it, and to that end confer on you corporate existence and the power to act in a corporate capacity, and also the further power to take lands for corporate use, *in invitum. The corporation is essentially a private one.* If it constructs and operates the road, it is to do it under the limitations and restrictions imposed by law. It may never, however, enter upon the construction of the proposed road. * * * * And if no duty is imposed to construct, it must follow that there is none to maintain and operate the road after the construction. Such duty cannot be created by the act of the corporation itself." Now, these observations of the court of New

York apply with equal force to the charter here, and, indeed, so far as we know, to all the railroad charters granted in this state; and after the people of Fond du Lac county have levied this money, there is nothing in the act of incorporation, or in that for imposing this tax, to bind the company ever to run a single car over the road, or prevent it from taking up the track and abandoning the use of the road entirely.

Another and the last point is upon the authority of those decisions in which it has been held that municipal corporations, when authorized, may become subscribers to the stock of these railroad companies.   It has been said that to discriminate between cases where stock has been subscribed for, and those where it has not but the money is to be given to the company, is "to dwarf and obscure the real nature of these works, and unduly to magnify into the place of principal, a feature which was merely casual, incidental and comparatively unimportant."   Whether this appears so or not depends very much upon what our attention is given to.   If we are looking to the rules and principles of law governing the subject, there would seem to be very good ground for the discrimination.   To the extent of the stock sub-. scribed the municipality *owns* the road, and it may be said to be *public* property.   We have seen that whether the public *own* the property enters very materially into the consideration of the question, whether the purpose is public or not.   We all know, too, that the position of one who gives as a gratuity to a corporation is very different from that of a stockholder in it.   The stockholder has certain legal and equitable rights, which he may enforce, while the giver of the gratuity has none. The stockholder may insist upon the strict application of his money to the legitimate purposes of the corporation.   He may restrain the directors and officers from squandering and misapplying it, and compel the company to use its funds in building and operating the road, according to the true intent of his subscription.

He who gives money to the company can exercise no such rights. And, besides all these, the correctness of this line of decisions, upholding municipal subscriptions to the stock of railroad companies, has been questioned by very high authority. Judge REDFIELD says: "For ourselves, we are free to confess that we never could comprehend the basis upon which so many able jurists in this country have professed to perceive clearly the reasons for giving municipal corporations the power to become stockholders in railway companies. We have always felt that it was one of those cases in jurisprudence where the wish was father to the thought." 2 Redfield on Railways, § 230, note 1. Certainly the consequences of upholding such subscriptions have been most sad and disastrous to many cities, towns and counties throughout the country; and it is obvious from the tenor of Judge COOLEY's remarks, that the doctrine does not meet his approbation. Const. Lim. 213, 214. Shall decisions thus doubted and questioned be held to justify or compel a further step in the same direction? We think not, and are prepared to say, as was said by Judge SHARSWOOD and the court in the special street taxation case in Philadelphia: "Thus far shalt thou go, and no further." *Hammet v. The City of Philadelphia*, 8 Am. Law Reg. (N. S.) 422.

The following dissenting opinion was filed by Mr. Justice PAINE at the June term, 1869:

PAINE, J. I cannot assent to the decision of the court in this case. The single question presented seems to me to have been already so thoroughly determined the other way, that it ought no longer to be considered even an open one. It is simply this, whether the construction of a railroad through a county is so wholly a private purpose, that an act of the legislature authorizing a tax to be imposed upon the county to aid in the work is void, as being beyond the scope of the legislative powers. That it is not, I think, is settled, if judical decisions

can settle any question. It is settled by two distinct lines of decision, in both of which the whole subject has undergone the most exhaustive discussion, and in both of which the same conclusion has been arrived at by an unbroken current of authority, to the effect that such a work, although carried on through the agency of a private railroad corporation, is, nevertheless, so far a work of a public character as to sustain the exercise of those powers which, it is admitted, can be exercised only for public purposes.

The first of these lines of decision is composed of those cases involving the question whether the legislature could delegate to these railroad corporations the right to exercise the sovereign power of eminent domain, by taking private property for public use. Of course the very head and front of the inquiry was, whether land so taken for a railroad to be constructed by a private corporation could be considered as taken for a public use, or whether it was only for a private use; it being conceded on all hands, that if for the latter only, then the power of eminent domain could not be exercised in its behalf, as that can only be exercised for the purpose of taking private property for public use. All the arguments were made in that class of cases against the power, that have been made here. And it is obvious that they were equally applicable, for the questions presented are identical. In each case the question is, Is the construction of a railroad, through the agency of a private corporation, a public purpose? And the courts have uniformly held, that, notwithstanding the resort to the agency of a private corporation, it was, from the character of the work, and its intrinsic importance to the community at large, a public purpose, sufficient to justify the exercise of the power of eminent domain. It was not considered, as the court seem to consider here, that it depended at all on the question whether a railroad company was technically a public or private corporation. On the contrary, it was considered, and

justly so, to depend on the nature and character of the work itself, and upon its effects and influence upon the general prosperity of the community. It cannot be necessary to refer to authorities to illustrate this position. It sufficiently appears from those referred to in the opinion of the court, in which the chief justice has emphasized, as it seems to me, the very clause which renders immaterial all that part of the opinion devoted to showing that a railroad company is a private corporation. He quotes as follows from Justice BALDWIN (1 Bald. C. C. 223): "Private corporations are for banks, insurance, roads, canals, bridges, etc., where the stock is owned by individuals, *but their use may be public.*"

Now this did not mean to assert that the use of all private corporations was equally public, or that an insurance company or bank was just as much for public use as a railroad or canal. It merely referred to those several classes as illustrations of private, as distinguished from public, corporations, and then it added, that, notwithstanding the corporation was private, its use *might* be public. And the judge then proceeded to state the criterion by which to determine whether its use was public or not, as follows: "A road or canal, constructed by the public or a corporation, is a public highway for the public benefit, if the public have a right of passage thereon by paying a reasonable, stipulated, uniform toll; *its exaction does not make its use private.* If the public can pass and repass, and enjoy its benefits by right, it matters not whether the toll is due to the public or a private corporation; the true criterion is, whether the objects, uses and purposes of the incorporation are for public convenience or private emolument, and whether the public can participate in them by right, or only by permission."

This shows that, though banks, insurance and railroad companies may be equally private corporations, yet there is a marked difference between the two former and the latter, in respect to their being for the public use.

This distinction, between those private corporations which are for private use, like banks, insurance and manufacturing companies, and those private corporations which subserve a public use and purpose, like turnpike, canal, bridge and railroad companies, is very clearly pointed out and illustrated by the argument in *Beekman v. R. R. Co.*, 3 Paige, 45 ; and that distinction has been fully recognized by the courts in all those cases where the validity of an exercise of the great sovereign powers of eminent domain and taxation has been in question. The judge accordingly proceeded to declare that the railroad "was undoubtedly a great public and useful purpose;" and so the courts have uniformly held whenever the same question has been presented.

Of what avail is it, then, to show that a railroad company is a private corporation? That is not the inquiry. There is no principle of law which prohibits the raising of money by tax, to be expended through the agency of a private corporation. The limitation of the power depends upon the use for which the money is raised. And when the very cases relied on to show that a railroad company is a private corporation, show also, without exception, that its use is a public use, they render the technical character of the corporation wholly immaterial, and directly sustain the right to exercise either the power of eminent domain or that of taxation in its behalf.

It is not contended, as seems to be assumed in the opinion of the court, that the delegation by the legislature to a railroad company, of the power of eminent domain, changes "its character from a private into an altogether public corporation, so that the people may be taxed for the purpose of giving the money directly to it." The question must be solved by something lying behind the mere act of delegating the power. It depends upon the grounds upon which the right to delegate it at all is to be sustained. If the object of the corporation is merely a private one, then the power cannot be delegated to it at all. The legislature cannot, by the

mere delegation of this power, infuse into the corporation that element of public use which must constitute the very basis of the right to delegate it. This must be determined only by an examination of the nature and objects of the work which the corporation is authorized to execute. And what is contended is, that after the courts, upon such examination, have declared that the construction of a railroad, although through the agency of a private corporation, is a public purpose, and that land taken for it is taken for a public use, they cannot, without an utter repudiation of their own reasoning, turn round and say in the next breath that it is so entirely a mere private purpose that any attempt to exercise the taxing power in its behalf is void.

I cannot see that the force of the argument to be derived from this class of decisions, sustaining the right to delegate to these companies the power of eminent domain, is at all diminished by any thing in the opinion of this court, or in that of the supreme court of Iowa, as delivered by C. J. DILLON, and which I have examined in a newspaper. That learned judge suggests that there are differences between the power of taxation and that of eminent domain; that in the one case there is actual compensation, and in the other none at all, or only theoretical; and that, because of these differences, it does not follow that wherever one power may be exercised therefore the other can.

But whatever differences there may be between those powers, the character of the use and purpose of a railroad remains the same. When once shown to be public, it remains public. And whatever differences there may be between those powers, they are alike in this, that each requires a public purpose to justify its exercise. Why, therefore, suggest immaterial differences, when in respect to the precise point in controversy they are identical? Or how can the court, which says that the construction of a railroad is a public purpose to sustain the exercise of the one, say it is not a public purpose

when the exercise of the other power is in question? He says that the power of eminent domain has been exercised in some instances in behalf of grist-mills, and argues that it would scarcely be contended that the power of taxation could therefore be so exercised. There might, perhaps, be a fair question whether either power should be exercised for that object. But when a court, upon a fair consideration of the whole subject, has once come to the conclusion that the building of a grist-mill, or any other enterprise, is so far of public importance as to justify an exercise of the power of eminent domain in its behalf, I confess I am at a loss to know upon what principle it could declare void an attempt by the legislature to exercise the taxing power in its behalf, upon the ground that it was not for a public purpose. There may be reasons of policy, which would address themselves to the legislature, why the one power might be exercised in cases where the other should not. But as a question of power, to be determined by the judiciary, there is no consistent reasoning by which a court can say that any particular work or exercise is public, so as to sustain an exercise of the one power, but not public, so as to sustain the other.

The other line of decisions I refer to is composed of those cases which have sustained the validity of stock subscriptions by counties, cities and towns, in aid of railroads. They are numerous and familiar, and need not be cited. The only distinction between them and the present case is, that in this there was no stock subscription. The tax to be raised was to be devoted outright to the construction of the work, with no other consideration than the general benefit to be derived from it. In the opinion of the court, this absence of the stock subscription is so material as to invalidate the law. In my opinion it was wholly immaterial, so far as the question of power was concerned.

It is true, that the form which aid to railroads by municipal corporations has usually taken has been

that of stock subscriptions. The reasons why it would naturally assume that form are obvious enough. But among all the cases where the validity of legislation authorizing such aid has been contested and sustained, I think not one can be found which has made the fact of such stock subscriptions material to the validity of the law. On the contrary, the struggle has uniformly been upon the very question made here, whether the purpose for which the tax was to be raised was a public or a private purpose. And the laws have been sustained, not upon the ground that the stock subscriptions made the enterprises public, but upon the higher and broader ground that the nature and character of the works themselves made them so.

The grounds upon which this class of decisions have been rested are so clearly stated by the chief justice in his opinion in *Hasbrouck v. Milwaukee*, 13 Wis. 43, that I cannot present them better than to quote his language. He says: "The power of municipal corporations, when authorized by the legislature, to engage in works of internal improvement, such as the building of railroads, canals, harbors, and the like, or to loan their credit in aid thereof, and to defray the expenses of such improvements, and make good their pledges by an exercise of the power of taxing the persons and property of their citizens, has always been sustained on the ground that such works, although they are in general operated and controlled by private corporations, are nevertheless, by reason of the facilities which they afford for trade, commerce and intercommunication between different and distant portions of the country, indispensable to the public interests and public functions. It was originally supposed that they would add, and subsequent experience has demonstrated that they have added, vastly and almost immeasurably to the general business, the commercial prosperity and the pecuniary resources of the inhabitants of the cities, towns, villages and rural districts through which they pass and with

which they are connected. It is in view of these results, the public good thus produced and the benefits thus conferred upon the persons and property of all the individuals composing the community, that courts have been able to pronounce them matters of public concern, for the accomplishment of which the taxing power might lawfully be called into action." This is a fair and forcible summary of the grounds upon which this kind of legislation has been sustained. Yet it will be observed that the mere incidental benefits of the stock subscriptions are not even mentioned ; though it now seems that, in the opinion of the court, they have assumed such importance as to constitute the essential basis of the power, while those other benefits that are mentioned seem to have so dwindled into insignificance that they are insufficient to support an exercise of the taxing power. And this, although it is the settled doctrine of this and other courts, that in order to justify a court "in arresting the proceedings and declaring a tax void, the absence of all possible public interest in the purposes for which the funds are raised must be clear and palpable." *Brodhead v. Milwaukee*, 19 Wis. 652.

I cannot see how such a result can be arrived at, except by excluding from the mental vision the great primary objects of a railroad, and of laws authorizing municipal aid, and exalting that which was merely casual and incidental into the undeserved place of that which was essential. But it seems to me very clear, that if, independent of a stock subscription, the construction of a railroad by a private corporation is so purely a mere private purpose that a tax to aid it must be held void, then such stock subscription cannot make it valid. For the legislature cannot authorize a municipal corporation, by a vote of the majority, to tax the minority to pay for stock in a private enterprise ; in an insurance or manufacturing company, for example. The purpose would remain a private purpose still. If the purpose is public, the tax is valid without the stock ; if private, it is invalid with it.

Nor can I understand upon what reasoning the court holds that both the stock subscription and the general benefits to be derived from having a railroad communication must concur to sustain a tax. If the stock subscription alone contains the public element essential to support a tax, then a municipal corporation in this state might be authorized to subscribe for stock in a New York railroad. So far as the mere profits to be derived as stockholders were concerned, that might be a better investment than to subscribe for a railroad here. But the bare statement of such a result is sufficient to expose the fallacy of the assumption. And if the stock sub scription does not contain this public element, then how can it be essential to the validity of the tax? If not found there, that element must be found in those other benefits mentioned by this court in *Hasbrouck v. Milwaukee.* If not found alone in either, then it cannot be found in both combined. If found alone in either, then wherever found it is sufficient to sustain a tax without the other. And there can be little doubt where it really exists, as the court still admits, "that the road must be one situated within or passing through the corporate limits of the municipality to be taxed, *and so promoting the general prosperity and welfare of the people who are to pay the taxes.*"

There is one case besides those referred to by the chief justice, where the question has been decided. It is that of *Gibbons v. Mobile & Great Northern R. R. Co.,* 36 Ala. 410. The statute under which the question arose, authorized the subscription to be made on such terms as might be agreed on, and an elaborate contract was made, providing that the city should issue bonds and receive stock, but it omitted to provide for any stock for the interest it might pay. This fairly presented the question; for it is obvious that if the legislature can require a municipality to pay two millions of dollars of taxes for one million of dollars in stock, it may require it to pay the

same sum without any stock at all. On page 439 the court said:

"It is further urged in favor of a reversal of the chancellor's decretal order, that, by the terms of the contract between the city government and the railroad, no stock is to be issued to the assignee or appointee of the city for the interest it may pay on the bonds. A full answer to this objection is furnished in the fact, that it would be no objection to the constitutionality of the contract if no stock had been reserved for either the principal or interest to be paid by the city. The power to aid the railroad, resting, as it does, on the taxing functions of the city, and not on the constitutional provision in relation to the taking of private property for public use, no direct pecuniary compensation to the tax payers is necessary to uphold it."

That this conclusion is correct seems to me almost too plain for argument.

If the decisions I have referred to had been originally established upon unsound reasoning, courts might be justified in refusing to follow them, except upon the same state of facts. But if the question were reëxamined anew, no different conclusion could be arrived at. Railroads are the great public highways of the world, along which its gigantic currents of trade and travel continually pour — highways compared with which the most magnificent highways of antiquity dwindle into insignificance. They are the most marvelous invention of modern times. They have done more to develop the wealth and resources, to stimulate the industry, reward the labor, and promote the general comfort and prosperity of the country, than any other and perhaps than all other mere physical causes combined. There is probably not a man, woman or child, whose interest or comfort has not been in some degree subserved by them. They bring to our doors the productions of the earth. They enable us to anticipate and protract the seasons. They enable the inhabitants of each clime to enjoy the

pleasures and luxuries of all. They scatter the productions of the press and of literature broadcast through the country with amazing rapidity. There is scarcely a want, wish or aspiration of the human heart, which they do not in some measure help to gratify. They promote the pleasures of social life and of friendship; they bring the skilled physician swiftly from a distance to attend the sick and the wounded, and enable the absent friend to be present at the bedside of the dying. They have more than realized the fabulous conception of the eastern imagination, which pictured the genii as transporting inhabited palaces through the air. They take a train of inhabited palaces from the Atlantic coast, and with marvelous swiftness deposit it on the shores that are washed by the Pacific seas. In war they transport the armies and supplies of the government with the greatest celerity, and carry forward, as it were, on the wings of the wind, relief and comfort to those who are stretched bleeding and wounded on the field of battle.

And yet, notwithstanding all these tremendous results, notwithstanding the states, counties, towns and cities of the country, fully appreciating their importance, have been bending all their energies to the construction of these great highways, notwithstanding the general government has donated vast tracts of its domain to aid in the object, we are now told that the public has not sufficient interest in the construction of a railroad to sustain an exercise of the taxing power, because, forsooth, in executing the great public work, the state has made use of the agency of a private corporation, and left to it the comparatively petty and unimportant profits to be derived from the actual operation of the road! I confess that such a conclusion is so utterly in conflict with what I had supposed to be the settled law, so inadequate to what seem to me the real merits of the great question involved, that it is a matter of astonishment that it could have been adopted by any mind. But as it has been adopted, I am forced to believe that,

from some cause, I do not fully appreciate the force of the argument in its favor.

I can see no substantial difference between Milwaukee taxing itself $100,000, or any other sum, to build a harbor, and the county of Fond du Lac taxing itself as much to build a railroad. The object is the same in each case, to open a better communication with the markets of the world, and furnish better facilities for trade and travel. The result is the same in each case, that is, to accomplish those very objects which the corporation had in view. There is in each case the like absence of any other benefit or profit to the municipality. All the profits of the carrying business on the water are reaped by private ship-owners. Milwaukee gets no share of it. All the profits of the carrying business on the railroad are derived by the private railroad corporation. Fond du Lac county gets no share of that. Where then is the difference? Certainly, the mere fact that one improvement is adapted to commerce on water, and the other to commerce on the land, cannot create any. Nor do I think that the fact that the harbor is public property creates any. That is a very barren and fruitless right. Its ownership is of no value whatever, except so far as it serves to accomplish those other purposes, of furnishing facilities for commerce. And it is obvious that they would be accomplished in precisely the same manner, though the title to the property was in a private corporation.

The same thing is true in respect to a common highway. A man may be taxed to build one on which he can travel a hundred miles in a stage, occupying two days' time, at an expense of nine or ten dollars. But to tax him to build a railroad on which he can travel the same distance in four hours, and at one-third the expense, is characterized by Judge JAMES, in the case referred to in the opinion of the court, as "legal robbery." Such talk is mere idle exaggeration.

In *The People v. Kerr*, 27 N. Y. 205, the New York court of appeals say: "*The great railways of the country are highways*, as well as city and county roads and city passenger railroads." This is undoubtedly the law and fact of the case. In *Bloodgood v. The M. and H. R. R. Co.*, 18 Wend. 13, Chancellor WALWORTH said, that a railroad was "a public improvement for the public benefit." Senator EDWARDS, in the same case, on page 21, says the object of the legislature "was not the private emolument the company was to receive for the use of the road," and that "for such a purpose the right would never have been conferred," but the road was chartered because "*the public* required the use of a railroad." Such has been the just and adequate conception of the subject taken by the courts, the legislatures and the people of the country, from that day to this. And to now take a different one, and hold that a right by the public to participate in the profits of the carrying business over these roads is that which gives them their public character, is to dwarf and obscure the real nature of these works, and unduly to magnify into the place of principal, a feature which was merely casual, incidental, and comparatively unimportant. I think the judgment should be affirmed.

The motion for a rehearing was denied.