NORTHERN PAC. R. CO. v. ROBERTS et al.

*(Circuit Court, W. D. Wisconsin. April 20, 1890.)*

**1. RAILROAD COMPANIES—MUNICIPAL AID—CONSTITUTIONAL LAW.**
    The use of a railroad, though owned by a private corporation, is public to such a degree as to authorize taxation in its support; and Laws Wis. 1883, c. 150, approving and ratifying the act of Douglas county in conveying to a railroad company lands which it held under tax-titles, to aid in the construction of the road through the county, is valid.

**2. QUIETING TITLE—PLEADING—DEMURRER.**
    A bill by a railroad company to set aside deeds of various tracts of land previously conveyed to it, and to quiet the title, is not demurrable on the ground that complainant is only in actual possession of a portion of the lands, and cannot maintain the suit as to that portion of which it has no possession. The demurrer goes to the entire bill, and does not lie if the bill is maintainable as to part of the lands embraced in it.

In Equity. On demurrer.
*Catlin & Butler*, for complainant.
*W. F. Bailey*, for defendants.

BUNN, J. This action is brought by the complainant to set aside two certain deeds of conveyance of a large quantity of lands lying in Douglas county, Wis., executed by said county to the defendant Roberts,—one on the 6th day of July, 1888, and the other on the 7th day of March, 1889,—and to establish and quiet the title to said lands in the complainant. There was a general demurrer put in by the defendants to the bill of complaint, and the case has been argued and submitted on such demurrer.

The essential facts, as appears by the bill, are as follows: That on the 7th day of September, 1880, the complainants had completed the line of road now known as the "Northern Pacific Railroad" as far eastward as the point known as the "Northern Pacific Junction," in the county of Carlton and state of Minnesota; and, being about to hold a meeting of its board of directors in New York to consider the extension of their line eastward from said injunction to some point on Lake Superior, the board of supervisors of Douglas county, at a meeting of said board duly held, adopted a resolution, and caused it to be entered of record, the substance of which was that—

"Whereas, the prosperity of the county would be greatly influenced by the manner in which, and the route upon which, said road should be extended, that, in the opinion of the board, a line of road entering the state at some point between the St. Louis and Nemadji rivers, and running thence all the way in Wisconsin, between said rivers, to a point on the bay of Superior at or near the mouth of Nemadji river, and thence along said bay of Superior to Connor's point, with sufficient docks or piers suitable for the transfer of passengers and freight from its cars to lake-going craft, and from said craft to said cars and depot at some point on said bay of Superior, between said Nemadji river and Connor's point, which said railroad company may select, and an eastern extension crossing the Nemadji river, at or near its mouth, at a point that will afford to said railroad company the best and most profitable route for its business, and best develop the county of Douglas and its re-

sources, therefore, resolved, that it is the duty and true policy of this board, by every means in its power, to promote the construction of the N. P. Railroad, the main line thereof, or a connection therewith, upon substantially such route, and that in behalf of said county, in aid of or inducement to the construction of a railroad, at an early day, in the manner and upon the route indicated in the resolutions, said board offers to said N. P. Railroad, upon condition that it accept the proposal within sixty days, and within the year 1881 construct and complete such railroad as above indicated, and make the connections therein set forth, the county of Douglas should, as soon as said road should be completed, transfer, by sufficient deed or deeds, to said N. P. Railroad Co., all the available lands or lots belonging to said county of Douglas, which have been acquired by deed, to which said county has held undisputed title during two years last past."

That this proposition was accepted by the railroad company, and the railroad built and completed within the time, according to the contract with the board of supervisors. There were some other stipulations in the contract, but enough had been set out, perhaps, to present the questions for decision. There is no dispute but that the road, with all proper docks, piers, etc., was built and completed, and all the connections properly made, by the company, pursuant to the agreement, and has ever since been maintained and operated by the complainant, and that the county board, by resolution, accepted the work, and made a conveyance of the land to the railroad company, pursuant to the resolution and agreement of the board, on January 20, 1882, which deed of conveyance was duly recorded, and that afterwards the legislature of the state of Wisconsin, in and by chapter 150 of the Laws of said state for the year 1883, approved and ratified the act of said Douglas county in so contracting with the complainant, and in so conveying the lands of the county. The bill further alleges that the complainant held such lands without question made of its right or title, paying large amounts of taxes thereon, from the time of such conveyance, in 1883, up to the month of July, 1888; that such lands were of no market value at the time of so entering into such agreement with the company for the construction of its road through Douglas county, but afterwards, by reason of the construction of such road, became of great value, and are now worth more than $200,000; that, since said conveyance of said lands by the county to the complainant, complainant has sold and conveyed to divers persons purchasing the same in good faith, and paying value therefor, a large number of the parcels of land so conveyed to it by the county, and whose titles thereto are based upon such conveyance by the county to the complainant; that on or about July 6, 1888, the defendant Roberts, combining, etc., with other persons, induced the board of supervisors of said county to sell to said Roberts, for the sum of $335, all the said land so conveyed before to the complainant, and to make a quitclaim deed of the same, which was duly recorded, and constitutes a cloud upon complainant's title. That, said deed to Roberts omitting, as it did, several parcels of the land so conveyed to the complainant, a second deed was made by the county to Roberts of the remaining parcels of land, which deed was for the consideration of $50, and was duly recorded. The bill also

alleges that the complainant company, upon the execution of the deed by the county to it, took, and has since held, the actual possession of a large part of the lands so conveyed, and has occupied the same, and is still so occupying it, for right of way, depot grounds, and so forth, and that other portions of the land are vacant, and unoccupied by anybody.

There are two grounds of demurrer to the bill. The first is that, the complainant not being in the actual possession, of the lands, it cannot maintain a suit to cancel the deeds to Roberts, and to quiet the title. The contention of the complainant is that, being in actual possession of a portion—some 30 pieces—of the land conveyed, and being entitled to maintain the action as to that portion, the court will retain the case, in order to do complete justice between the parties, and not turn the complainant over to his action of ejectment to recover the land conveyed by the same instruments, of which it does not have actual possession; that, to save a multiplicity of suits, the court, obtaining jurisdiction by reason of the complainant's actual possession of a portion of the lands, will retain jurisdiction, and adjudicate the entire controversy in equity.

The principle invoked by complainant is a familiar one, and may be properly applicable to this case. Whether it be so or not, I have not found it necessary to decide on this demurrer, as the demurrer goes to the entire bill; and, if the bill is maintainable as to part of the land, the demurrer will not lie. This point, if a good one, can be taken advantage of by special plea or answer, or without either plea or answer, upon final hearing; the facts appearing upon the face of the bill.

The other ground of demurrer is that the county board of supervisors had no authority, and the legislature had not the power to confer authority upon such board, to make a conveyance of the land belonging to the county, and which it held under tax-titles, to aid in the construction of a railroad through the county, and therefore the act of the legislature ratifying the act of the county board is unconstitutional and void.

It has been assumed upon the argument that the question stands upon the same footing as that determined by the supreme court of Wisconsin, in 1870, in the case of *Whiting* v. *Railroad Co.*, 25 Wis. 167; and I have no reason to doubt the correctness of this view. The land donated was a fund belonging to the county as a result of taxation, and making a donation of it to aid in the construction of a railroad through the county would be the same, in principle, as levying a tax for the same purpose; and though the supreme court of the United States, in the case of *Olcott* v. *Supervisors*, 16 Wall. 678, coming up on writ of error to the United States circuit court for the eastern district of Wisconsin, and arising upon the same state of facts, reached a conclusion directly contrary to that reached by a majority of the court in *Whiting* v. *Railroad Co.*, this court is now urged, for the sake of a uniformity of decision upon the same question in the state and federal courts sitting in the same state, to disregard the decision of the supreme court of the United States, and to adopt and follow the decision of the court of last resort in the state. And certainly it would be a very desirable object to make the rule uniform in the two jurisdictions, if it could be done with propriety

of judicial decorum. It is always to be deplored that residents and non-residents of the state should not be subject to the same rule of property in the federal and state courts sitting in the same state, and this court will go as far as judicial propriety can warrant to avoid such an anomalous condition in the administration by two equal and co-ordinate jurisdictions. But I more than suspect it is not within the power of this court to remedy the evil, and that the supreme court of the state is the only body that can better the situation, and put all suitors in the two jurisdictions upon the same footing of right and remedy.

The United State supreme court, in *Olcott* v. *Supervisors*, not satisfied with the conclusion reached in *Whiting* v. *Railroad Co.*, refused to follow that decision upon two grounds: *First.* It was not a local question. It was not the determination of any question of local law. It was not a question where the construction of any state statute, or any state constitutional provision, was in issue. On the contrary, it was one of general jurisprudence. It related to the general powers of any state legislature over the subject of taxation within the state, and might arise as well in one state as another. It was particularly a question whether the construction and maintenance of a railroad owned by a corporation is a matter of public concern. The taxing power of a state confessedly extended only to the raising of moneys for a public use. If a railroad was a private, as distinguished from a public, use, then the state had not authority to levy a tax for its support, or to authorize a municipality to tax itself; and this question was one of general law. It had as much reference to the constitution of any other state as it had to that of Wisconsin. Its solution, therefore, must be sought, not in the decision of any single state tribunal, but in general principles common to all courts. The nature of taxation, what uses are public and what private, and the extent of unrestricted legislative power, were matters which, like questions of commercial law, no state could conclusively determine for the federal courts. *Second.* The court had always held that if a contract, when made, was valid under the constitution and laws of a state as they had been previously expounded by its judicial tribunals, no subsequent action of the legislature or the judiciary will be regarded as establishing its invalidity. Prior to the decision of *Whiting* v. *Railroad Co.*, it seemed to have been well settled in Wisconsin, as elsewhere, that the construction of a railway was a matter of public concern, and not the less so because done by a private corporation. It was on this ground that the courts of the state had held that the power of eminent domain might be exercised by the state, and the citizen's land or house taken at the instance of a railroad corporation, for a right of way or for depot grounds, etc. See *Pratt* v. *Brown*, 3 Wis. 612; *Hasbrouck* v. *Milwaukee*, 13 Wis. 37; *Robbins* v. *Railroad Co.*, 6 Wis. 641; *Soens* v. *Racine*, 10 Wis. 280; *Brodhead* v. *Milwaukee*, 19 Wis. 652. All these adjudications, declaring the construction of a railroad to be a matter of public concern, and the use a public one, justifying the exercise of the taxing power and that of eminent domain, had been made previous to 1870, and before the county bonds then in suit were issued. The court was not concluded

then by a decision made in 1870, after the bonds were issued, that such public uses were not of a nature to justify the imposition of taxes. As the transactions in this suit occurred long since the decision in *Whiting* v. *Railroad Co.* was announced, the consideration is urged upon the court, that there is not the same reason for not being bound by the decision that there was in the case of *Olcott* v. *Supervisors*, and it is true that the contract was made with reference to the law as it stood in 1882; so that the only question, aside from the general merits of the controversy, is whether the United States court should consider itself bound by the decision of the state tribunal upon a question of this character. But this question was conclusively determined by the United States supreme court, as has been seen in the case referred to, and as it has in many other adjudicated cases before and since that time. So that this court is powerless to make the rule uniform, so long as an appeal lies from its decisions to the United States supreme court. On the contrary, the supreme court of the state, if the question should again come before it, may, with the utmost grace and propriety, put itself in line upon this question, not only with the uniform course of judicial decisions in the federal courts, but with that of the decisions of all the state courts that have passed upon this question, with the single exception of the state of Michigan, and, I might say, with its own decisions made previous to 1870. At the time *Whiting* v. *Railroad Co.* was decided, the supreme court of the state was constituted of three judges, two of whom concurred in the opinion, while Justice PAINE delivered a very able and vigorous dissenting opinion, in which he met and answered fully, to my mind, the position taken by the majority of the court. In the opening sentence of that opinion, he says:

"The single question presented seems to me to have been already so thoroughly determined the other way that it ought no longer to be considered even an open one."

If that could be said at that time, it may, perhaps, with still greater reason, be said now, after the progress of 20 years of legislation and judicial opinion upon the subject, that the question should be considered settled and at rest, whatever may be thought by individuals upon the question of municipal aid to railroads as a mere question of public policy. The people will generally, in the end, have their own way upon questions of this character, and so they have in this case. They wanted to tax themselves to aid in the building of railroads for the improvement of localities, and the public acts of more than 20 states, enabling them to do so, attest the public sentiment of the country upon the matter of policy. The highest courts in all these states, with the exception of Michigan and Wisconsin, have held such laws constitutional; and the supreme court of Wisconsin, prior to the decision in *Whiting* v. *Railroad Co.*, had given no indication of dissent from the general current of opinion. The entire logic of the case in *Whiting* v. *Railroad Co.* had been repeatedly given away by previous decisions. In *Hasbrouck* v. *Milwaukee*, 13 Wis. 43, the chief justice, speaking for the court, said:

"The power of municipal corporations, when authorized by the legislature, to engage in works of internal improvements, such as the building of railroads, canals, harbors, and the like, or to loan their credit in aid thereof, and to defray the expenses of such improvements, and make good their pledges, by an exercise of the power of taxing the persons and property of their citizens, has always been sustained on the ground that such works, although they are in general operated and controlled by private corporations, are, nevertheless, by reason of the facilities which they afford for trade, commerce, and intercommunication between different and distant portions of the country, indispensable to the public interests and public functions. It was originally supposed that they would add, and subsequent experience has demonstrated that they have added, vastly and almost immeasurably to the general business, the commercial prosperity, and the pecuniary resources of the inhabitants of the cities, towns, villages, and rural districts through which they pass, and with which they are connected. It is in view of these results, the public good thus produced, and the benefits thus conferred upon the persons and property of all the individuals composing the community, that courts have been able to pronounce them matters of public concern, for the accomplishment of which, the taxing power might lawfully be called into action."

A clearer or more forcible statement of the grounds upon which nearly all the decisions, state and federal, on this question, rest, could hardly be made, and it is entirely in accord with the great weight of reason and authority upon the subject; and yet in *Whiting* v. *Railroad Co.* the law authorizing municipal aid to a railroad was held unconstitutional on the ground that a railroad corporation is a private concern, and the court also distinguish between cases where the municipality is allowed to take stock in a railroad corporation, and lay a tax to pay for the shares, and one where this precious privilege is not provided for,—a distinction which, so far as my researches have extended, is nowhere else made by any court. The waste of intellectual energy required for any court to maintain itself upon so narrow a basis of reason is something sad to contemplate, for any one who has any proper regard for a just conservation of these forces. If the use of a railroad is public, as had before been repeatedly held by the court, and by all other courts, and in such a degree as to warrant the exercise of the power of eminent domain, of what moment was it that the property itself, and the business, was owned by a private corporation? Was the use any the less public for that reason? If the use is a public use for the purpose of invoking the state's power of eminent domain, though the business is carried on by the agency of a private corporation, why is it not a public use for the purpose of invoking the power of taxation? The lands or houses of one person cannot be taken away, and given to a private corporation, if the business of the corporation is private. It is on the ground that the use is public, and only on that ground, that this extraordinary reserved power of eminent domain can be called into requisition; and that the use of a railroad is public seems too evident to any ordinary capacity to require argument to sustain it. And by the course of legislation and judicial opinion in the last 20 years, since *Whiting* v. *Railroad Co.* was decided, that use seems to have become more and more emphatically public, and railroads brought more and more under public control and regulation. The

·doctrine has become, by repeated decisions of the state and federal courts, and by a long course of legislation, as firmly established as any doctrine can be, that, though the property and business of a railroad are private, its use, touching the public interests, as it does, at all points, is a matter of public concern, to such a degree as to give the states and general government a strong regulating and supervisory control, almost unlimited in extent, short of impairing the obligation of contracts, and the confiscation of private property. The state, within reasonable limits, may regulate freights, not by arbitrary enactment without regard to the question whether the sums allowed will leave a reasonable profit upon the business, because such a law would amount to confiscation, but in a reasonable manner, to conserve the interest of the railroad and the public. It may require the track to be fenced, and necessary guards placed. It may regulate the rate of speed, the building of extra or double tracks, the raising or lowering of grades at certain places, in the public interest, and a great many other things which the public good may require,—all on the ground that the incorporators have brought their property in connection with a public use, and therefore are subject to public control. Every state has its railroad commission, and now the government has taken under control the regulation of all lines connected with the interstate commerce of the country. Railroads are the great public highways of the country, and are more emphatically public than any other, unless it be ocean highways. They constitute the most important agency in carrying on the trade and commerce of the world that exists, and do more to stimulate, develop, and uphold the industries of the country, reward the labors of husbandmen and manufacturers, and add to the general comforts of modern civilized life, than any other material agency,—if, indeed, an agency may be called wholly material which attracts and draws into its circle of activities the ablest and best minds of the country. As is said by the supreme court of Illinois in *Railroad Co.* v. *Smith*, 62 Ill. 268:

"The benefits resulting to the people of the state from our system of railroads are untold and incalculable. The mind can scarcely grasp them. Railroads have almost superseded all other means of intercommunication between the several parts of our extensive and growing state. They have become an absolute necessity, indispensable to our increased growth, and to the removal of our immense surplus. They have added millions to our taxable property, given augmented facilities to every department of trade, enriched the mass of the people, largely enhanced the value of our lands, built up manufactures, and brought us into close proximity with the best markets of the country. All share in the blessings flowing from them. Railroads are in truth the people's highways for pleasure and business and commerce. Without them, our internal trade would languish and die, and our corn and wheat rot in our granaries."

In *Brodhead* v. *Milwaukee*, 19 Wis. 658, which was a case under the state law for the raising of taxes to pay bounties to volunteers, the court held that—

"To justify a court in declaring a tax void, and arresting proceedings for its collection, the absence of all possible public interest in the purposes for which

the funds are raised must be so clear and palpable as to be immediately perceptible to every mind."

But assuming that to be the rule, though, perhaps, too strongly put, how can any court so shut its eyes and ears to things known to the .commonest observation as to say that, in the construction of a line of railway, there is such absence of all possible public interest as to make the fact immediately perceptible to every mind at first blush?

Again, how does it add anything to the character of a railroad, as being of a public or private use, for a municipality to take stock in it? It is admitted that, if a county take stock in a railroad, it may then be empowered by the legislature to levy a tax in its aid, though the court intimate in one case (*Phillips* v. *Town of Albany*, 28 Wis. 357) that, if they had it to decide over again, the ruling might be different. But it is quite evident that the power of the legislature to raise taxes cannot rest upon any such trivial circumstance. It is not a question of a proper consideration for a contract, or, if it were, the building of the road would constitute a consideration; but it is a question of legislative power under the constitution, and the right to tax does not require that any consideration or inducement should be paid or held out to the tax-payer. In this respect the power to tax is more far-reaching, pervasive, and arbitrary than that of eminent domain, where a compensation must be paid. In *Railroad Co.* v. *McDonald*, 53 Miss. 245, the supreme court of Mississippi lays down what I have no doubt is the correct rule, as follows:

"There is no just distinction between a donation and a subscription for stock in such an enterprise. To recognize such a distinction is to disregard the fundamental theory of aid to railroads. That is not to make the municipality a stockholder for dividends on stock, or direct returns from an investment for profit, but to aid the enterprise for expected benefits to result to the public from its success. The end to be accomplished, and not the means of its accomplishment, by assistance from the municipality, is the matter to be considered."

The liability to taxation is one of the concessions and sacrifices for the general good which every citizen is required to make when he becomes a member of the body politic.

Again, if the question turned upon the matter of taking stock, it would follow that a city or county would be authorized to take stock in any private enterprise, like farming, insurance, or manufacture, and tax the people to pay for the same. But no court would ever hold that this could be done. The purpose must be a public purpose, and the use a public use, in order to invoke the taxing power. It is of the very essence of a tax that the money should be raised for a public purpose, and be laid according to some rule of uniformity; otherwise, it would be an arbitrary exaction amounting to confiscation. Equality of taxation means equality of sacrifice, and is required for the same reason that it ought to be in all affairs of government, which should make no distinction of persons or classes. Mills, Pol. Econ. (5th Ed.) 296. But if the purpose be public, and the rule uniform, it was never held that there must be any other compensation than the supposed general benefit arising out of

the public use to which the money is appropriated. If the use is public, there is no need that the county should become an owner in the corporation to support taxation. If not public, the taking of stock, and becoming part owner, would do nothing towards the support of such right. The distinction is too trivial and unsubstantial for any court to stand upon. The supreme court of Wisconsin could well afford to stand alone upon this question, if it had a considerable basis of reason and argument to support it. But, in looking through the cases that have taken that side of the question, I cannot avoid the conviction that the conclusions reached have been founded quite as much upon what might be regarded as a wholesome distrust of the legislative discretion as upon any solid legal basis. But this power of taxation must be lodged somewhere. It is properly a legislative power, and who can say that the people have erred in intrusting it, under the constitution, to the legislative will? And the decision of the question as to what is a public use, in such a degree as to authorize taxation in its support, would seem to be one as properly to be left to the politician and statesman as to a judge on the bench. There is no patented monopoly on political wisdom; and, if it is the duty of the legislature to keep within constitutional limits, it is no less the duty of the judiciary to do the same thing. Both are liable to err, but each should do its utmost to keep within its own proper jurisdiction. If the legislature abuses its discretion, as is liable to be the case, the people have it in their power, always, to correct the evil, either by choosing representatives to carry out their will, or by amending the organic act, as has been done in some of the states, so as to either limit the power of taxation for railroad purposes, or abolish it altogether. But in a majority of the states the power is still in force, and, though it may have been abused in some instances, possibly the advancement of the public interest has been as well attained and conserved under such legislation as it would have been without it; and at any rate, whatever we may think of the policy, after so many millions of lands and money have been given away by congress, and by the people of the states, it would seem almost too late now to question the authority. The power of legislation on the part of the states is general, and not specially delegated. It is broader than that of congress; and yet it is settled beyond question, by the highest authority, that the various acts of congress donating the public lands to aid in the construction of railroads are constitutional and valid laws.

It may be noted that the chief justice, in the opinion in *Whiting* v. *Railroad Co.*, refers to the case of *Hanson* v. *Vernon*, then an unreported case, by the supreme court of Iowa, since reported in 27 Iowa, 28, as sustaining the conclusions arrived at by the majority of the court in the Wisconsin case; and so it did, indeed. But after that decision the legislature of Iowa re-enacted the same statute with amendments, but not changing the principle of the law in any respect; and the supreme court, in a very well considered opinion, held the law valid, disregarding their previous decision in *Hanson* v. *Vernon*. See *Stewart* v. *Polk Co.*, 30 Iowa, 9. The act in Iowa provided "that it shall be lawful for any township,

incorporated town, or city to aid in the construction of any projected railroad in this state, as hereinafter provided." Laws 1870, c. 102, § 1. The act did not provide for the taking of any stock, or any special compensation to the towns and cities to be taxed. The court, in a well-reasoned opinion by MILLER, J., held that the taxing power is one of the sovereign powers vested in the general assembly, and not being limited, either expressly or by clear implication, by the constitution, to the condition of making compensation, the judicial power possesses no authority to thus limit it. So that about all the aid and comfort, so far as authority goes, which the courts of Wisconsin can rely upon, are the decisions in Michigan. The decisions there have been pronounced by a very able judge, and rest upon somewhat more consistent, if not broader, grounds, as they make no distinction between aid with and without subscription for stock. But Judge COOLEY, in the leading case on the subject, (*People* v. *Township Board of Salem*, 20 Mich. 452,) finally rests the case upon the fact that the policy of the state in respect to building railroads had changed. He says:

"Our policy in that respect has changed. Railroads are no longer public works, but private property. * * * It was at one time, in this state, deemed true policy that the government should supply railroad facilities to the traveling and commercial public; and while that policy prevailed the right of taxation for the purpose was unquestionable."

To my mind, this admission gives away the entire argument, so far as the question of constitutional power is concerned. How a constitution could be changed by a change of policy, without changing the constitution itself, is not so easy to see; and how the policy was changed so long as the legislature, in plain terms and by express enactment, still continued to provide for aid by the several towns and counties of the state, is also not very apparent. Indeed, the dimensions of such an argument, "to any thick sight, are invincible." I had supposed, to render a law unconstitutional, it must contravene some express provision of the constitution, and not some supposed general policy not manifested by express terms, (*Pattison* v. *Supervisors*, 13 Cal. 175,) and also that if an act of the legislature may be valid or not, according to circumstances, a court would be bound to presume that such circumstances existed as would render it valid, (*Talbot* v. *Hudson*, 16 Gray, 417.) The learned judge, in his invaluable work upon Constitutional Limitations, teaches us a safer and better doctrine. He says, using the language of Judge BALDWIN, of the supreme court of the United States:

"The rule of law upon this subject appears to be that, except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not, in any particular case. The courts are not the guardians of the rights of the people of the state, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people, in their sovereign capacity, can correct the evil; but

courts cannot assume their rights." Cooley, Const. Lim. (5th Ed.) 201; *Bennett* v. *Boggs*, Baldw. 74.

Again:

"Nor are the courts at liberty to declare an act void because, in their opinion, it is opposed to a spirit supposed to pervade the constitution, but not expressed in words. * * * 'It is difficult,' says Mr. Senator Verplanck, 'upon any general principles, to limit the omnipotence of the sovereign legislative power by judicial interposition, except so far as the express words of a written constitution give that authority.'" Cooley, Const. Lim. 205; *People* v. *Fisher*, 24 Wend. 215.

Still again, Judge Cooley says:

"The legislature is to make laws for the public good, and not for the benefit of individuals. It has control of the public moneys, and should provide for disbursing them only for public purposes. Taxes should only be levied for those purposes which properly constitute a public burden. But what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion, which cannot be controlled by the courts, except, perhaps, where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful. Where the power which is exercised is legislative in its character, the courts can enforce only those limitations which the constitution imposes, and not those implied restrictions which, resting in theory only, the people have been satisfied to leave to the judgment, patriotism, and sense of justice of their representatives." Const. Lim. *129.

Now, one would suppose that it would require but a cursory view of this question upon its merits, allowing that there were no precedents on the subject, and the question was now to, be considered *de novo*, to see that there is absolutely no limitation upon this power in the state constitution. I have always learned, and have never heard it questioned, that the general assembly of a state may lawfully exercise all the legislative power that any free state possesses, except so far as it is limited by the state, or by the United States, constitution.. All sovereignty originally inheres in the people, and the people have divided it into three great governmental divisions,—legislative, executive, and judicial. It is quite different in that country from whence we derive our laws. In Great Britain, the parliament, and, as we might with propriety say, the house of commons, in these later times, has grown to the stature of a supreme executive as well as legislative council, besides wielding no small modicum of judicial authority. See Bryce, Amer. Com. (1st Ed.) 278. The English people are ruled by the house of commons. Bageh. Eng. Const. 206. He would be a bold judge, indeed, in England, who should refuse to enforce a statute passed by the parliament, because contrary to the English constitution, and in doing so would but marshal the way for his own impeachment. A law in England which changes the constitution is still a law, and must be enforced by the courts. Lord Coke has said:

"The English parliament may do anything which is not naturally impossible to be done. It may alter the succession of the crown, as it has done in more than one instance, or change the constitution. But it cannot prevent earthquakes, nor alter the course of the seasons."

Except in a few particular instances, such as passing upon the qualifications of its own members, punishing for contempt, and the exercise of the power of impeachment, and trial thereon, a state legislature cannot exercise either executive or judicial power. But in respect to purely legislative authority the legislature is omnipotent, unless restrained and limited by constitutional enactment; and it is not necessary, in any case, to look into the constitution, as we must into the United States constitution to ascertain the power of congress, to find the authority for legislative action. It may exercise all that grand residuum of legislative power that belonged originally to the people, and has not been conferred by them upon congress, nor prohibited to the legislature by provision of the state constitution. We look into the constitution of the United States for grants of legislative power, but into the constitution of the state to ascertain if any limitations have been imposed upon the complete power with which the legislative department of the state was vested in its creation. Cooley, Const. Lim. 207. No doubt the severest limitation upon the legislative power comes through this strict division of the governmental powers of the state. Many things which parliament might do, a state legislature could not, on account of this written limitation. A court, by its judgment and execution founded on due process of law, may take the land or money of one person, and hand it over to another, though the purpose be not public at all. But this is a judicial power, and cannot be exercised by the legislature. Now, it seems quite clear that as the legislature has the general authority to raise taxes, in its own discretion, although the power to tax includes the power to destroy, as said by Chief Justice MARSHALL,—there being no limit upon the power except what comes, if at all, through this division of the powers of the state into legislative, executive, and judicial,—the courts ought to exercise great caution, and proceed upon no uncertain ground, in adjudging a law to be unconstitutional, and therefore void, which by its very enactment has been pronounced constitutional and valid by two equal and co-ordinate departments of the government. And such is the rule laid down by the courts. No law should be pronounced unconstitutional unless it is clearly so. If there is reasonable doubt, the legislative and executive departments of the state having pronounced it constitutional, and the presumption being always in favor of its constitutionality, the court should enforce the law, unless clearly convinced that the legislature has transcended its powers. The court of errors of New York, in *Clark* v. *People,* 26 Wend. 599, says:

"The courts ought not, except in cases admitting of no doubt, to take upon themselves to say that the legislature has exceeded its powers."

In *Santo* v. *State*, 2 Iowa, 208, the court said:

"Although the power is universally admitted, its exercise is considered of the most delicate and responsible nature, and is not resorted to unless the case be clear, decisive, and unavoidable."

Similar language is used by the court in *Morrison* v. *Springer*, 15 Iowa, 304. In *Perry* v. *Keene*, 56 N. H. 530, a case where the authority of the legislature to empower towns to tax themselves to aid in the construction of railroads was under review by the court, Judge LADD, speaking for the court, said:

"In one view, the duty of the court is extremely plain and simple. In another, it is very delicate, and not free from difficulty. We have not to inquire into the policy of the law, or, if the purpose be admitted to be public, whether the supposed public good to be attained was sufficient to justify the legislature in conferring upon two-thirds of the legal voters of a town the power to devote, not only their own property, but that of the unwilling other third, to such a purpose. All mere questions of expediency, and all questions respecting the just operation of the law, within the limits prescribed by the constitution, were settled by the legislature when it was enacted. The court have only to place the statute and the constitution side by side, and say whether there is such a conflict between the two that they cannot stand together. If, upon such examination, there appears to be a conflict, and if the conflict is so clear and palpable as to leave no reasonable doubt that the legislature have undertaken to do what they were prohibited from doing by the constitution, the court cannot avoid the high, though unwelcome, duty of declaring the statute inoperative, because the constitution, and not the statute, is the paramount law, and the court must interpret and administer all the laws alike."

The supreme court of Vermont, with the same question before it, has also said:

"It is obvious, therefore, in dealing with this question of constitutional power, that the presumptions are all in favor of the validity of the action called in question; and, if we find invalidity at all, it must be upon clear and irrefragable evidence that the action challenged is in conflict with some express provision of the organic law, or its necessary implications." *Town of Bennington* v. *Park*, 50 Vt. 191. Also, to the same effect, *Lane* v. *Dorman*, 3 Scam. 238; *Foster* v. *Bank*, 16 Mass. 245; *Hartford Bridge Co.* v. *Union Ferry Co.*, 29 Conn. 227.

In any view we may take of the case, the use is a public one; and an accumulation of the different views, if there were space and need for such illustration, would serve to throw further light on the question. The owners of railroads are common carriers. They cannot distinguish between different persons. They must carry for all that come, and for reasonable rates, controllable by the public. If they refuse to receive freight that is offered, they are liable to an action in damages; and, indeed, in such case the aggrieved party would not confined to the slow remedy by action, but might sue out a *mandamus* to compel the corporation to carry his goods. They must provide adequate and sufficient rolling stock to do the business offered, and cannot excuse themselves for not receiving freight or passengers on the ground of the lack of any of these things which it is in their power to provide. Apply any of these tests to a corporation, the use of whose property is private, and the distinction between a private and public use is apparent. Now, the

question presents itself something in this shape: Is it clear, beyond any reasonable doubt, and by evidence irrefragable, that the use of a railroad is not a public use? If the use is strictly private, then the legislature cannot authorize taxation in its aid, because it cannot take the property or money of one person, and hand it over to another, with or without compensation, for a mere private purpose. But, if the use be a public use, then it is admitted that the legislature may levy a tax to aid in the construction. It seems almost a self-evident proposition that the use of a railroad is public. It is so as a matter of common knowledge. It has been so adjudged by the United States supreme court, and by the highest courts in every state in the Union, for the purpose of invoking the power of eminent domain in the condemnation of real estate for right of way, depot grounds, round-houses, freight-yards, etc. Indeed, this power was thoroughly settled in the leading case of *Beekman* v. *Railroad Co.*, 3 Paige, 45, and has never been questioned since. Under the constitution of this state, and, I apprehend, all the states, this power cannot be exercised by the legislature except for a public use, and upon payment of a just compensation; and this great power the state might no doubt exercise without compensation awarded, but for such constitutional limitation. Allowing this to be the true doctrine in this and all of the states, who will say that the use of a railroad, although owned by a private corporation, is so clearly and universally a public use where the question arises as to the lawful exercise of the power of eminent domain, but that, when the kindred question of taxation is raised, it is just as clearly, and beyond reasonable doubt, not a public, but a private, use? One would think it were not in the power of dialectics to maintain such a proposition, and that the Socrates of Plato would quail at the task; and, after reading and re-reading the opinions of Chief Justice DIXON and of Judge COOLEY, where this Herculean labor is undertaken, I find it quite impossible to call to mind the reasoning by which they severally arrive at their conclusions. One would suppose, if a reason could be given for such a distinction, it might be stated in few words, and in a form to be appreciable to the ordinary understanding. But, after reading through pages and folios, there is not much to remember but words, which seem all the more difficult to fix in the mind on account of the lack of matter which attends them.

The question is well stated by the supreme court of New Hampshire, in *Perry* v. *Keene*, as follows:

"The argument then admits that the use is public, but holds that it is not sufficiently public, or is not public in the particular way, to bring it within the category of objects for which taxes may be imposed. Either in degree or kind, the public quality which it confessedly possesses falls short of that required by the constitution to justify an exercise of the taxing power. It is incumbent on those who undertake to maintain this distinction to point out clearly the differences on which it rests. An assertion that it does exist is not enough; nor is the argument advanced by a repetition of such assertion, even though made in confident and emphatic terms. What is the rule wherewith we are to determine when a given public use is of a character to warrant the exercise of one power, and not the other? What is the principle to

be applied? No one will contend that the power of eminent domain, and the taxing power, though similar, are in all respects identical; but all agree that neither can be exercised except for a public end. Which is the higher power; or, in other words, which requires the greater public exigency to call it forth? What is the nature of those objects which lie on one side of the line, and what of those upon the other side? Where is the line to be drawn, and what are the reasons that determine its location? These are some of the questions not to be evaded or met with much speech and ingenious ratiocination, but to be answered fairly and clearly, before a court can say that the legislature have, beyond all reasonable doubt, transcended their constitutional powers in declaring that a use which is of such character—that is, public in such sense that private property may be taken and appropriated in its behalf—is also public in such a sense that taxes may be levied in its behalf. In those cases to which we have been referred by plaintiff's counsel, where an attempt to do this is made, it does appear to me the failure has been rendered only more conspicuous by the eminent ability of those who have undertaken the task; and, after a most careful examination of those cases, if we were told that a railroad, being a public use for which the lands of individuals may be taken, against their consent, is not a public purpose for which taxes may be imposed, I should be utterly at a loss what sound reason to give for the distinction, or in what terms to frame a rule to govern the future action of the legislature in cases of a like description. Unless the court are to stand between the people and their representatives, and declare when the latter have misjudged in their deliberations, and set up limits to the legislative powers of the general court not found in the organic law of the state, it is clear to my mind that this law cannot be annulled by a judicial sentence or decree." 56 N. H. 540.

. The state has always exercised the authority to tax the people to build and maintain highways, and the authority is not questioned. It may do so itself, or through individuals or corporations, and authorize the establishment of toll-gates. It may build a road through the state, or any part of it. It may authorize a town or county to build a town or county road, and tax its people for its construction and maintenance. This power has been recognized and practiced from very ancient days, and from the first dawn of civilized life. It was common in the times of the Roman empire, and has come down to us from immemorial days, and through immemorial usage. It has always been exercised in this country from the first settlement of the colonies. The practice and the principle are older than the common law, or the present nations of the world, and have been transmitted to us from a period now darkened to view by time and distance. Laying aside, then, the question of public policy, of which the state must judge, why should the naked authority be now questioned simply because the necessities of civilization have demanded a more commodious method of travel than the old common highway could afford? The following are some of the leading cases on the subject: *Beekman* v. *Railroad Co.*, 3 Paige, 45; *Brocaw* v. *Gibson Co.*, 73 Ind. 543; *Allison* v. *Railway Co.*, 10 Bush, 1; *Town of Bennington* v. *Park*, 50 Vt. 192; *Perry* v. *Keene*, 56 N. H. 514; *Walker* v. *City of Cincinnati*, 21 Ohio St. 14; *Sharpless* v. *Mayor of Philadelphia*, 21 Pa. St. 147; *Railroad Co.* v. *Smith*, 62 Ill. 268; *Hallenbeck* v. *Hahn*, 2 Neb. 377; *Ex parte Selma & G. R. Co.*, 45 Ala. 696; *Davidson* v. *Commissioners*, 18 Minn. 482, (Gil. 432;) *Railroad Co.* v. *McDonald*, 53 Miss. 240; *People* v. *Mitchell*, 35 N. Y.

551; *Gibbons* v. *Railroad Co.*, 36 Ala. 410; *Thomson* v. *Lee Co.*, 3 Wall. 327; *Bloodgood* v. *Railroad Co.*, 18 Wend. 10; *Worcester* v. *Railroad Corp.*, 4 Metc. 564; *Stewart* v. *Polk Co.*, 30 Iowa, 9; *Town of Queensbury* v. *Culver*, 19 Wall. 83; *Railroad* v. *County of Otoe*, 16 Wall. 667; *Olcott* v. *Supervisors*, Id. 678; *Louisville* v. *Bank*, 104 U. S. 469; *Fairfield* v. *County of Gallatin*, 100 U. S. 47; *County of Moultrie* v. *Fairfield*, 105 U. S. 370; *St. Joseph Tp.* v. *Rogers*, 16 Wall. 664; *Rogers* v. *Burlington*, 3 Wall. 664; *Mitchell* v. *Burlington*, 4 Wall. 270.   The demurrer is overruled, and defendants given 30 days in which to answer the bill of complaint.